THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MIKE MORRIS, a/k/a Michael Morris, Defendant-Appellant.

First District (1st Division)   No. 77-1577

Opinion filed October 2, 1978.

David P. Schippers, of Schippers, Betar, Lamendella & O'Brien, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Joan S. Cherry, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McGLOON delivered the opinion of the court:

Defendant was charged with attempt murder, three counts of aggravated battery, and armed robbery. After a jury trial, defendant was found guilty on all the above charges. The trial court entered judgment on the verdicts and sentenced defendant to concurrent sentences of five to eight years in the Illinois State Penitentiary.

Defendant now appeals and makes the following contentions: (1) that the court erred in refusing to strike certain identification testimony; (2) that the court erred in not permitting the defendant to introduce into evidence a police report; (3) that the court's refusal to grant a continuance so that witnesses might be produced for the defense was error; and (4) that the accumulation of alleged errors operated to deny the defendant a fair trial.

We affirm.

The first witness to testify at trial was the victim, Philip Williams, who indicated that at about 7:45 p.m. the evening of September 28, 1976, he left his girl friend's apartment at 2111 West Lake Street in Chicago to visit a friend. Upon leaving the apartment he heard an individual named Wayne call out to him. Williams stopped to speak with Wayne. The area was well lighted and Williams noticed the defendant and three other males standing about 10 feet away. Two of the four men, the defendant and a man named Sims, approached Williams. The defendant came very close to the side of Williams. Sims approached on the other side, searched Williams, and took his jacket and $20. During the search, the defendant trained a gun on Williams. The men who robbed Williams then ran into a building at 124 North Hoyne. Wayne told Williams that he had been robbed by "Rick," "Monkey" and Mike, but did not say who was whom. Williams further indicated that he knew none of the men who robbed him.

After the robbery, Williams returned to his girl friend's house and

called the police. While waiting in front of his girl friend's house for the police, Williams saw the same men who had robbed him. The defendant, who was approximately 15 feet from Williams, pulled out a gun and started shooting. One of the bullets struck Williams in the thigh.

Williams started to run, spotted a detective car, and told the detectives he had been shot. At this time, Williams noticed that Chicago Housing Authority guards were chasing the defendant and his group. More police arrived and Williams told an officer the names that Wayne had told him. Williams described the man who shot him as 5 feet, 6 inches tall and wearing brown pants and a dark leather jacket. When asked if the jacket was black or brown, Mr. Williams stated, "I was looking more at his face and at a gun." Williams also testified that one of the men was wearing a dark jacket with an insignia in the shape of an "eagle" or a "large white bird" on the back. He told the police officers that the man who shot him had a "brownish-red" streak in his hair. The police took Mr. Williams to Cook County Hospital where he identified Arthur Sims as one of the men who had robbed him.

The following day, the police conducted a lineup in Williams' hospital room. Williams identified the third man in the five-man lineup, the defendant Morris, as one of his assailants. Williams testified that at the time of the lineup the red streak had been removed from the defendant's hair.

The next witness called by the State was Officer Patrick Logan who testified that at approximately 8:30 p.m. on September 28, 1976, he received a radio message informing him of a robbery victim at 2111 West Lake Street. Officer Logan arrived at the scene and observed that Williams had lost a lot of blood and was going into a state of shock.

Officer Logan interviewed the victim for a few seconds and took notes on a scratch pad. Williams told him that he had been accosted by four individuals. On cross-examination, after examining his police report, Officer Logan stated that he numbered the four individuals for purposes of that report, as "one," "two," "three" and "four." He stated that according to his report, number "one" was chased by the CHA guards. He also stated that he did not have an independent recollection as to whether number "one" was the individual who Mr. Williams said had shot him. One of the individuals, whom Officer Logan labeled as number "two" had a brown streak in his hair. The officer stated that he recalled from the case report that the name "Rick" was ascribed to individual number "one." "Rick" was described as having black hair. The victim told him that $20 and a jacket had been taken from him.

Alfonso Rollins, a Chicago Housing Authority guard, testified that at approximately 8:30 p.m. on September 28, 1976, he was patrolling the CHA buildings near Hoyne and Lake Streets when he heard several shots

and saw a young man bleeding from the right leg running toward him. At the time the lighting conditions were good and Rollins also saw four young men, one of whom had an object in his hand, running in a westerly direction. A squad car arrived and Rollins and one of the officers chased the four youths. During the chase, Rollins closed to within 20 feet of the men and had a chance to see their faces. One of the four men had a brownish-red streak in his hair and was wearing a dark brown leather jacket with an emblem on the back of it. Although Rollins did not know the name of the man with the streak in his hair, he had seen him around the 2245 building numerous times prior to the date of the incident. Rollins also testified that he saw the defendant's face during the chase. He identified the defendant, Mike Morris, as the individual he saw that evening with the brownish-red streak in his hair. Rollins also indicated that the defendant was the man who had the object in his hand.

Rollins knew one of the individuals, Arthur Sims, by name, informed the police of this fact, and went with them to arrest Sims. They went to Sims' house at 2245 West Lake and Rollins noticed a black leather coat in Sims' apartment. Rollins testified that Sims was wearing a black leather coat during the chase.

The next witness called by the State was Officer William Kobart who testified that at approximately 8:30 p.m. the night of the shooting he arrived at the scene and encountered Williams bleeding. Williams told Officer Kobart that he had been robbed and shot and that his assailants had fled in a westerly direction. Officer Kobart ran in a westerly direction and encountered two CHA guards and a police officer coming toward him. At Mr. Rollins' direction, Officer Kobart, his partner, two other police officers, and the two CHA guards went to 2245 Lake Street. They informed an elderly lady there that they were looking for Arthur Sims. The police encountered Sims upstairs. They also found a leather jacket with some embroidery work on the back. Sims was taken to the emergency ward at Cook County Hospital where he was identified by Williams as one of his assailants. Then Officer Kobart and his partner went to 1218 West Hastings in an unsuccessful attempt to locate the defendant Morris. They returned to the same address the following day. The defendant's mother answered the door, admitted the officers, and called to her son who came downstairs.

Officer Kobart indicated that at the time of the defendant's arrest there was no streak in his hair. However, at the time of his arrest, the defendant stated that he had the streak removed that morning.

The first witness to testify for the defense was Roberta Sims who lives at 2245 West Lake Street. She testified that at approximately 7 p.m. the evening of the incident Michael Morris and Arthur Sims were at her house. They left sometime after 7 p.m. and returned an hour later. Morris

stayed 20 minutes then left alone. He returned, stayed for another 20 minutes, then left for the evening. Roberta Sims further testified that her brother Peter owned a black leather jacket with some "white on the back" and that Arthur Sims also wore that jacket. When the police arrived the jacket was lying on the bed. The police then took Arthur to the police station.

The defendant's mother, Mrs. Morris, testified that in the early morning hours of September 29, 1976, the police came to her house looking for her son. She called her daughter's house, discovered Michael Morris was there, and told him the police were looking for him. He returned to his mother's house the following day and the police arrested him.

Both Mrs. Morris and Roberta Sims testified that on the date of the incident the defendant had a red streak in his hair. Mrs. Morris testified that the streak was removed the day after the incident.

The defendant, Michael Morris, testified in his own behalf. He testified that at approximately 6 p.m. on September 28, 1976, he was at Roberta Sims' house. At about 6:45 p.m. he and Arthur Sims went to see their friend, Wayne Brown. After staying at Brown's house for half an hour the three of them left for Hoyne and Warren streets. On the way to Hoyne and Warren, Wayne stopped to talk to Philip Williams. The defendant testified that he and Arthur "stepped across the street," about 25 to 30 feet away from Wayne and the victim. The defendant went on to testify that while Wayne and Williams were talking "a group of men or boys," whom the defendant did not recognize, pulled a gun on Williams. The defendant and Arthur Sims then returned to Arthur's house.

The defendant returned to the scene to get some marijuana and heard some shooting. He testified that he saw two groups of boys but did not see the shooting. He went to the Sims' apartment and stayed for about 20 minutes. He then went to his sister's house.

The defendant testified that on the night of September 28, 1976, he had a red streak in his hair. On September 29, 1976, when he was arrested he no longer had the streak in his hair. The defendant had the streak removed earlier that day at a beauty shop. The defendant denied participating in either the robbery or the shooting of Philip Williams.

The final witness to testify, Wayne Brown, testified as a court's witness. He testified that on the night of September 28, 1976, he was talking with Philip Williams when Williams was robbed at gunpoint. Prior to talking with Mr. Williams, Wayne Brown had been with the defendant and Arthur Sims. When Brown was asked if Michael Morris had been one of the robbers he said, "No, not that I seen." He stated that he did not know who the robbers were, and he did not call the police.

Defendant first contends that the trial court erred in not striking the identification testimony of both the victim, Philip Williams, and the CHA

guard, Alfonso Rollins. Defendant argues that the identifications were so unreliable that their admission into evidence was a denial of defendant's due process rights. Defendant first argues that the lineup in Williams' hospital room was unduly suggestive because the defendant was the middle person in the lineup and the only participant wearing a red shirt and a long coat. Defendant also argues that the other four individuals in the lineup bore no resemblance to the defendant.

Assuming, without deciding, that the lineup was unduly suggestive, we conclude that the trial court did not err in refusing to strike Williams' identification testimony. Evidence of an unnecessarily suggestive identification may be admitted at trial if the reliability of the identification under the totality of the circumstances is shown. (*Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967.) In *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, the Illinois Supreme Court, quoting from *Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375, outlined the following factors for evaluating the identification testimony of a witness:

> " 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' " (67 Ill. 2d 564, 571, 367 N.E.2d 1313, 1317.)

Reviewing the instant record in light of the above factors, we first conclude that Williams had an adequate opportunity to see the defendant. Williams testified that during the robbery the area was well lighted and that the defendant was "right close to [him]." Williams further indicated that when the men who had robbed him returned to the area they were about 15 feet away when he saw the defendant take out a gun and start to shoot. Moreover, there is no indication that Williams exhibited any hesitancy in making his identification. Nor does defendant cite any inaccuracy in the identification Williams gave to the police. In fact, Williams clearly testified that one of his assailants had a red streak in his hair, a unique characteristic admitted by the defendant at trial. In addition to the above factors, the lineup confrontation occurred within 24 hours of the incident. Under the totality of the circumstances the lineup identification was reliable and properly admitted into evidence.

■■ We similarly believe that under the totality of the circumstances Mr. Rollins' testimony was reliable and properly received into evidence. Mr. Rollins testified that after hearing the gunshots and seeing the victim bleeding, he saw four young men running in a westerly direction. Rollins also testified that he saw the defendant's face during the chase. While it does not appear from the record that Mr. Rollins ever gave or was asked

for a complete description of the men he chased, it is clear that he described one of the men with an object in his hand as having a streak in his hair. Defendant objects to the length of time between the occurrence and Rollins' in-court identification, 12 months. He also objects to the fact that the defendant was the only black seated at counsel's table when Rollins identified him in court. This latter factor does not render the identification invalid. (*People v. Gregory* (1976), 43 Ill. App. 3d 1052, 357 N.E.2d 1251.) Moreover, Rollins testified that he had seen the defendant numerous times in the past, a factor which strengthens his identification testimony. (*People v. Grey* (1973), 14 Ill. App. 3d 310, 302 N.E.2d 473.) This fact would mitigate any unreliability stemming from the length of time between the confrontation and in-court identification. We conclude the trial court correctly received the identification testimony into evidence.

■■ Defendant next contends that the trial court erred in not allowing the defense to introduce into evidence Officer Logan's police report. Generally, police reports are not admissible into evidence. (*People v. Richardson* (1977), 48 Ill. App. 3d 307, 362 N.E.2d 1104; Ill. Rev. Stat. 1975, ch. 38, par. 115—5(c)(2).) Although police reports may not be used to divulge substantive evidence, they may be used for the limited purpose of impeachment or refreshing a witness' recollection. (*Hall v. Baum Corp.* (1973), 12 Ill. App. 3d 755, 299 N.E.2d 156. See also Supreme Court Rule 236; Ill. Rev. Stat. 1975, ch. 110A, par. 236.) In the instant case, the trial court permitted the defense to use the police report to refresh the recollection of Officer Logan, the police officer who prepared the report. The trial court placed no limitation on the use of the police report for that purpose. However, when the defendant sought to introduce the police report as substantive evidence, the trial court properly ruled it inadmissible.

Defendant next contends that the trial court erred in refusing to grant a continuance so that he could procure the testimony of several policemen involved in the arrest of the defendant and another subject. This contention revolves basically around the testimony of Alfonso Rollins, whom defendant refers to as a "surprise witness." Mr. Rollins' name was not listed on the State's list of witnesses but was included within that list's notation, "CHA Guard—Names and Addresses to be supplied when determined." Just prior to noon on a Friday when Mr. Rollins was called to testify during trial, defense counsel replied, "This is one of the CHA guards? Okay, it wasn't on my list." At this time defense counsel did not object to Mr. Rollins' testimony, nor did he ask for a continuance. On Friday afternoon, defense counsel caused subpoenas to be served on several police officers calling for their appearance in court on Monday. On Monday, when none of the police officers appeared, the trial court

granted a request to recess for one and one half hours so that defense counsel could procure the attendance of the police officers. When the police officers again failed to appear at the end of the recess, defense counsel requested an additional 24 hour continuance which the trial court denied. The defense then rested. Defendant contends that the trial court abused its discretion in refusing the continuance and in support thereof argues that Mr. Rollins' testimony was contradicted by information contained in police reports prepared by several of the subpoenaed officers. The first contradiction, defendant argues, is contained in a police report prepared by Officers Bosworth and Struke dated September 29, 1976. That report indicates that the CHA guard who pursued the offenders after the shooting and who supplied the information needed to locate the offenders was a CHA guard by the name of Walker. We find no contradiction between the information contained in the above police report and the testimony of Mr. Rollins. At no point did Mr. Rollins testify that he supplied all of the information that led to the arrest of the defendant or that he was the only CHA guard to chase the defendants. In fact, Mr. Rollins testified that he and his partner, CHA guard Richard Walker, chased the assailants. Mr. Rollins' testimony in this regard was corroborated at trial by Officer Kobart.

Moreover, nowhere in the report of Officers Bosworth and Struke does it appear that they even talked to any of the CHA guards. The report indicates that "Beat 1368 B [Officer Kobart] proceeded to try and locate a CHA guard who had pursued the offenders of the shooting and lost same. The above 1368 B located CHA guard Walker and obtained such information needed and proceeded to try and locate the offenders." Considering the police report as a whole, we believe that none of the information contained therein contradicted any of the testimony of the State's witnesses and would not have affected the outcome of the trial.

Defendant also cites a second police report prepared by Officers Bellavia and Konior and argues that this police report also contradicts the testimony of Mr. Rollins. This second police report indicates that CHA guard Walker identified the jacket at the time of Sims' arrest. This report also lists the time of Sims' arrest as 11:15 p.m. We see no contradiction between the information contained in the police report and the testimony presented at trial. Mr. Rollins testified that he led the police to Sims' apartment and identified Sims. He never testified he identified the jacket. This was corroborated in Officer Kobart's testimony. Officer Kobart also explained the apparent inconsistency in the times of the arrest. Officer Kobart indicated that although Sims was taken into custody within a short period of time after the shooting which had occurred around 8:30 p.m., Sims was not booked or charged until 11:15 p.m. We see no

inconsistencies between the two police reports and Mr. Rollins' testimony at trial.

■■ The defendant correctly indicates in his brief that although the question of granting a continuance is within the sound discretion of the trial court (*People v. Irving* (1973), 15 Ill. App. 3d 563, 304 N.E.2d 655), the trial court may abuse its discretion where the refusal to grant additional time has in some way embarrassed the accused in the preparation of his defense and thereby prejudiced him. (*People v. Canady* (1971), 49 Ill. 2d 416, 275 N.E.2d 356.) In the instant case, we see no prejudice suffered by the defendant due to the trial court's failure to grant a continuance, and thus find no abuse of discretion in the trial court's order denying the continuance.

Defendant also complains of an accumulation of errors which operated to deny him a fair trial. Defendant first objects to testimony concerning the arrest and identification of Arthur Sims, who was not named as a co-defendant. Defendant contends that this testimony was particularly damaging because Sims' sister later testified for the defendant. We first conclude that inquiry into the arrest of Sims was proper because it served to explain the recovery of the jacket with an insignia on the back described by the victim. Defendant has contended throughout that the victim had no opportunity or was in too much a state of shock to observe his assailants. The recovery of the jacket was certainly relevant to the witness' ability to observe and identify his assailants. As to the victim's identification of Sims, defense counsel objected to this area of inquiry, then withdrew his objection. Defendant thus has no basis for urging error in this regard on appeal. *People v. Trefonas* (1956), 9 Ill. 2d 92, 136 N.E.2d 817.

■■ Defendant next contends that the trial court erred in refusing Mrs. Morris, defendant's mother, to testify concerning conversations she overheard between the defendant and police officers. In sustaining the objection to such testimony, the trial court ruled in part that the testimony would be hearsay. Case law indicates that evidence of this type is admissible if the person who made the declaration is present, testifies, and subject to cross-examination. (*People v. Keller* (1970), 128 Ill. App. 2d 401, 263 N.E.2d 127.) It is true that during the State's case Officer Kobart testified concerning a conversation he had with the defendant at the defendant's home. Officer Kobart testified that after he advised the defendant of his rights the defendant told him he had the streak removed from his hair. We note that the defendant himself took the stand and testified that he had the streak removed the day after the shooting. Since he took the stand, defendant also had the opportunity to testify concerning his conversation with Officer Kobart and contradict any

damaging portion of that testimony. However, the direct examination of defendant never touched upon this area. Under these circumstances, even if the trial court erred in sustaining the objection to the defendant's mother's testimony, we fail to see any prejudice suffered by defendant.

Defendant also complains of the trial court's failure to explain to the jury the fact that Wayne Brown was a court's witness. Although we believe the trial court should have informed the jury of the above fact, we see no prejudice suffered by the defendant due to the trial court's failure to do so. We first note that defense counsel informed the jury during closing argument that Wayne Brown was a court's witness. Moreover, Brown's version of the facts closely corroborated the defendant's testimony. We see no prejudice suffered by defendant, nor has defendant pointed out to us any prejudice suffered due to the trial court's failure to identify Wayne Brown as a court's witness.

Defendant also complains of a comment made to him by the trial judge during the prosecution's closing argument. This comment was precipitated when the prosecution referred back to a question defense counsel asked the victim during cross-examination concerning the victim's selling marijuana. The prosecution intimated this was slandering the witness. Defense counsel objected and stated he had produced evidence. The trial court overruled the objection and indicated the comment was unsupported by the evidence and instructed the jury to disregard it. We first conclude that there was no evidence presented showing that the victim was selling marijuana. Defense counsel's comment invited the rebuke by the trial court. Moreover, we see little, if any, prejudice suffered by the defendant as a result of the trial judge's comment.

Defendant finally complains of two comments made by the prosecution during closing argument. Neither of these comments was objected to at trial and as a result the error, if any, is waived. *People v. Edwards* (1973), 55 Ill. 2d 25, 302 N.E.2d 306.

We further note that defendant has filed a motion for the reduction of bail and that we have taken that motion with the case. We hereby deny defendant's motion for a reduction of bail.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

GOLDBERG, P. J., and BUCKLEY, J., concur.