THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
EDWARD GARRETT, Defendant-Appellant.

First District (1st Division)   No. 1—87—1194

Opinion filed June 28, 1991.

Michael J. Pelletier and Ann C. McCallister, both of State Appellate Defender's Office, of Chicago, for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Margaret M. Regan, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

Defendant, Edward Garrett, was jointly indicted with his codefendants in a multicount indictment. Garrett's trial was severed from the codefendants'. Following a jury trial, Garrett was convicted of one count of attempted murder, two counts of armed robbery and four counts of aggravated battery. The court declared a mistrial as to the attempted murder of V.S. and aggravated criminal sexual assault charge upon which the jury was unable to agree. He was sentenced to concurrent prison terms of 25 years for armed robbery, 20 years for attempted murder and 7 years for aggravated battery.

Defendant raises the following issues on appeal: (1) whether the State failed to prove beyond a reasonable doubt that defendant specif-

ically intended to kill E.S.; (2) whether the defendant was denied a fair trial when (a) the prosecutor was allowed to read into evidence a police report notation regarding an alleged statement made by defendant, (b) a police officer was allowed to testify that he was assigned to the "Special Prosecutions Gang Unit," (c) the trial court refused to clarify a point of law requested in a note from the jury and responded to the jury's note out of the presence of either defendant or his lawyer; (3) whether the court erred by giving a jury instruction defining the word "victim"; and (4) whether the convictions and sentences for two counts of aggravated battery must be vacated because they are lesser included offenses of attempted murder, or alternatively, because they arise out of the same physical acts as the attempted murder conviction. The following evidence was presented at trial.

About midnight on May 6, 1985, E.S., accompanied by his aunt, travelled from Indianapolis to Aurora to visit relatives. He exited the expressway in Illinois in search of gas.

They ultimately found a gas station and purchased gas. E.S. concluded that he was lost and unable to find his way back to the expressway, so he used a pay phone at the gas station to call his relative in Aurora for directions. While talking on the telephone, E.S. was approached by a young man on a bicycle who introduced himself as "James" and inquired as to whether E.S. was having trouble. "James" offered to direct them back to the expressway, but he stated that he first must tell his father where he was going. E.S. accepted the offer, allowed "James" to put the bicycle he was riding in the trunk of E.S.'s car, and then drove "James" to three different locations. "James," under the guise of searching for his father, directed E.S. to the three locations. The last of the three locations was a housing project known as Altgeld Gardens. E.S. parked his car in front of a lighted building and proceeded to get out of the car to check his water and oil while "James" walked towards a small apartment building and shouted for someone to come down. "James" then returned to the car accompanied by a man he introduced as his cousin, Lamont. In actuality, "James'" true name was Edward Garrett, the defendant herein, and "Lamont's" true name was Walter Munson (hereinafter Munson), one of the codefendants severed from this action.

E.S. testified that a few minutes after the defendant and Munson returned to the car, Munson struck him from behind and he fell to the ground. Munson picked E.S. up, placed a knife to his throat and said "give me your money or I will kill you." The defendant and Munson began hitting E.S. and kicking him in his face. E.S. gave the defend-

ant his billfold containing $150, family pictures, and his driver's license. A third man identified as Theodus Spence, also a codefendant, joined the group and began beating E.S. E.S. then saw the defendant and Spence drag V.S. out of the car, hit her and remove her rings. The last thing E.S. heard was V.S. saying "please don't kill me." E.S. then reached for a picture of his baby lying on the ground and while reaching for the picture, Spence kicked him in the mouth and E.S. lost consciousness. When he regained consciousness he went to the roadway for help and saw the police arresting Spence.

V.S. testified that the defendant and another man pulled her out of the car and the defendant dragged her by her hair and collar into some bushes. The defendant had a six-inch switchblade which he placed at her throat and said "drop your pants, bitch, or off your head comes." The defendant had vaginal intercourse with V.S. twice during a 10- to 15-minute period. Upon completion, defendant returned to the car and V.S. followed him. Defendant emptied the contents of V.S.'s purse on the ground, took her wallet, watch and rings and began beating and kicking V.S. She was able to get back into the car, and when E.S. regained consciousness, he also got back into the car. V.S. informed E.S. that she had been beaten and raped by the defendant. The defendant and the two codefendants ran at the sound of police sirens.

Officer Richard Cap testified that on May 7, 1985, at approximately 2:10 a.m., he responded to a radio dispatch that a battery was in progress near east 134th Street. Another call was received over the radio stating that "someone was being dragged into the woods." When they neared the location, they saw Spence running in front of the police car and arrested him. Officer Cap then saw another man running and chased him for five blocks. However, he lost sight of that suspect.

V.S. and E.S. were taken to Roseland Community Hospital and treated for their injuries by Dr. Doddanna Krishna. A physical examination of E.S. revealed lacerations and trauma to the face, skull and extremities. The laceration of his lip required 15 stitches and two of his teeth were missing due to a recent trauma. Dr. Krishna concluded that E.S.'s injuries could be considered as life threatening but he was released four hours after arrival. Upon examination of V.S., Dr. Krishna concluded that V.S. had multiple injuries, predominantly to her face, nose and cheekbone. The gynecological examination revealed a small amount of whitish liquid present in the vaginal area but no lacerations, abrasions or swelling. V.S. was admitted to the hospital and discharged later that day because she wanted to go home. Dr.

Krishna determined that V.S.'s injuries could also have been life threatening.

When E.S. left the hospital, he went to the police station and identified a photo of Munson from an array of photos. Munson was found at the defendant's house by Detective James Lotito with a can of Old Milwaukee beer, *i.e.*, the same brand of beer that V.S. had offered them earlier. Both Munson and the defendant were arrested and the beer was confiscated as evidence. At the police station E.S. identified Munson and the defendant in a lineup. V.S. also identified the defendant in a lineup upon her release from the hospital. After testifying on cross-examination that his report contained nothing relating to defendant's participation in the beating of E.S., on redirect Detective Lotito testified, over defense counsel's objection, that his report contained a statement reportedly made by defendant to his accomplices, wherein defendant said, "Take everything. The keys and the money and let's get the fuck out of here."

Mary Ann Furlong, a Chicago police laboratory technician, testified that she analyzed blood samples of the three assailants and the two victims. She concluded that the defendant's gym shoes were stained with human blood consistent with V.S.'s blood grouping. She further testified that she did not find any evidence of sperm or seminal fluid when she analyzed a vaginal swab taken from V.S. Additionally, an analysis of the defendant's jockey shorts failed to indicate the presence of semen or sperm.

Sergeant John Stevens testified that he was assigned to the "Special Prosecutions Gang Unit" in the State's Attorney's office. He stated that he witnessed the drawing of the blood and he retained custody and control over the blood samples until they reached the Chicago police crime lab. Defense counsel moved for a mistrial as a result of Sergeant Steven's testimony that he was assigned to the "gang unit" or alternatively that the court give the jury a cautionary instruction. The motion was denied. At the completion of the State's case, defendant's motion for a directed verdict was denied and he rested his case without presenting any evidence.

While the jury was deliberating, the jury sent a note to the trial judge asking, "Does the threat of murder constitute attempted murder? Does there have to be 'intent' of murder shown?" The trial judge sent a written response directing the jurors to "read your instructions." After several hours of deliberation the jury could not reach a verdict on the charges of aggravated criminal sexual assault and attempted murder of V.S. The court declared a mistrial as to those counts, and the jury found the defendant guilty of attempted murder

of E.S., the armed robbery of E.S. and V.S. and four counts of aggravated battery of E.S. and V.S. The defendant's motion for a new trial was denied.

■ The first issue the defendant raises is whether he was convicted by proof establishing his guilt beyond a reasonable doubt that he specifically intended to kill E.S. In order to prove defendant guilty of attempted murder, the prosecution was required to prove that defendant committed an act which constituted a substantial step toward the commission of a murder and that defendant acted with the intent to kill the victim. (*People v. Graham* (1985), 132 Ill. App. 3d 673, 682, 477 N.E.2d 1342, 1346.) Defendant maintains that the State's evidence failed to prove that defendant specifically intended to kill E.S., since the character of the assault did not permit an inference of the requisite intent, citing *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28, and *People v. Jones* (1989), 184 Ill. App. 3d 412, 429, 541 N.E.2d 132, 142-43. The State responds that intent can be inferred in this case from the very beginning of the encounter when defendant lured two innocent people to his own turf, where he then was joined by his two cohorts, who together beat the victims severely, stole from them, stopping the beating only when the police arrived upon the scene. The trial testimony, however, belies the latter assertion. V.S. testified that she heard sirens after the beating had concluded. Hence, the State's contention that the police sirens "saved the lives" of the complainants is not supported by the record. The State further seeks to support its argument that defendant had the requisite intent to kill E.S. by relying on the evidence regarding injuries sustained by V.S. This reliance is also misplaced since the jury hung on the charge of attempted murder of V.S. Additionally, the evidence of specific intent must be viewed independently as to each attempted murder victim. *People v. Velasco* (1989), 184 Ill. App. 3d 618, 634, 540 N.E.2d 521, 531.

In *People v. Thomas* (1970), 127 Ill. App. 2d 444, 262 N.E.2d 495, a case relied on by defendant, the defendant was armed with a knife which he held on the victim while raping her, using it a few times to prick and probe her body. He struck the victim repeatedly, knocked her head against furniture, and even stabbed her in the shoulder. While the attack was in progress, he also threatened several times to kill her. The defendant was ultimately convicted of rape, attempted murder, robbery and aggravated battery. The review court reversed the attempted murder conviction, finding that the evidence was insufficient to establish the requisite mental state.

*People v. Jones* (1989), 184 Ill. App. 3d 412, 430, 541 N.E.2d 132, 142-43, established facts extremely similar to those in the instant case. The victim was beaten about the body, kicked repeatedly and suffered a broken nose at the hands of armed assailants. Additionally, they verbally threatened to kill the victim and his family. The victim in that case was treated on an outpatient basis and received a number of stitches for various lacerations. This court found there that the character of the attack on the victim did not warrant an inference of an intent to kill.

■ Likewise, in this case, the assailant was armed, yet did not use the weapon on the victim, and repeatedly assaulted victim causing lacerations and other serious injuries and also threatened to kill E.S. The victim was treated in the emergency room at the hospital as an outpatient. As a result of the attack, he received 15 stitches to his lip and lost two teeth. While the doctor testified that E.S.'s injuries "could be" life threatening, E.S. was released from the hospital without being admitted only four hours after his arrival there. Even though his injuries were serious enough, it must be noted that "every assault involving serious bodily injury does not necessarily support a conviction for attempted murder." *(People v. Jones,* 184 Ill. App. 3d at 429-30, 541 N.E.2d at 143.) Just as it was in *Jones,* the character of the attack on E.S. was not of the type that justifies an inference of an intent to kill. Hence, even viewing the evidence in a light most favorable to the prosecution, as we must do, we fail to find sufficient evidence of specific intent to sustain defendant's conviction for attempted murder.

Two other issues which are related to the attempted murder charge will be briefly discussed. Defendant raises an issue regarding the court's response and handling of the jury's request for clarification of a point of law requested in a written note during jury deliberations. The jury's request consisted of two questions: (1) "Does the threat of murder constitute attempted murder?" and (2) "Does there have to be 'intent' of murder shown?" The court, in the absence of defendant, defense counsel and the prosecutor, responded in writing, directing the jury to "read [the] instructions." In light of our prior resolution of the conviction for attempted murder, there is no necessity to address this issue. The other issue raised relating to the conviction for attempted murder is whether the convictions and sentences for two counts of aggravated battery must be vacated because they are lesser included offenses of attempted murder or, alternatively, because they arise out of the same physical acts as the attempted murder conviction. Because we have reversed the attempted

murder conviction, we need only consider whether vacatur of one of the aggravated battery convictions is warranted. Defendant argues that each count of the indictment alleges the very same act. Both counts premise the aggravated battery on the identical act of knocking E.S.'s teeth out, but allege two separate sections of the statute, *i.e.*, section 12—4(a) and section 12—4(b)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, pars. 12—4(a), (b)(1)).

In *People v. Hawk* (1980), 80 Ill. App. 3d 827, 400 N.E.2d 499, this court held that defendant's acts of hitting and kicking the complainant would not support two separate convictions for aggravated battery since the hitting and kicking occurred almost simultaneously, at the same place and against the same individual. The court described defendant's acts as "clearly indivisible." *Hawk*, 80 Ill. App. 3d at 829, 400 N.E.2d at 500.

■ Likewise, in the instant case, the time lapse between the repeated hitting and kicking of E.S. in the face was insignificant. The evidence elicited at trial reveals that Munson and Garrett struck and kicked E.S. in the face. E.S. surrendered his wallet to Garrett and then Spence approached and commenced beating E.S. At this time, Spence kicked E.S. in the mouth, resulting in the loss of two of his teeth. But more importantly, each count referred to the kicking out of the two teeth. The prosecutorial intent appears to bear out defendant's contention that both counts alluded to the same factual matrix. Accordingly, one count of aggravated battery will be vacated.

Defendant next contends that the court erred by giving a jury instruction defining the word "victim." The instruction in question is Illinois Pattern Jury Instructions, Criminal, No. 11.66 (2d ed. Supp. 1989), which reads as follows:

> "The word 'victim' means a person alleging to have been subjected to the offense of aggravated criminal sexual assault."

It was given over defense objection, and on appeal defendant asserts that the instruction unduly served to convey the judge's sympathy toward V.S. and implicitly informed the jury that as a matter of law V.S. was a victim. Thus, defendant argues, the instruction failed as a neutral principle of law. Defendant maintains that by defining this word, which is a nontechnical word of common usage, undue emphasis was focused on V.S.'s testimony and served to improperly direct the jury's attention to a portion of the evidence. Conversely, the State argues that this issue is moot since the instruction related to only the charge of aggravated criminal sexual assault and the jury failed to reach a decision as to that charge. Because of this result, the State argues that the jury was obviously not convinced that V.S. was a "vic-

tim" of aggravated criminal sexual assault which, it urges, inured to defendant's benefit.

■ Taking into consideration the facts and the applicable law, the trial court must use IPI instructions unless it deems such instructions as inaccurately stating the law. (*People v. Mitchell* (1979), 78 Ill. App. 3d 458, 462, 397 N.E.2d 156, 160.) The purpose of jury instructions is to provide for the jurors those principles of law applicable to the facts that will aid the jurors to reach a correct conclusion in accordance with the law and the evidence presented at trial. (*People v. Plum* (1976), 44 Ill. App. 3d 922, 925, 358 N.E.2d 1235, 1237.) A court of review, in determining the adequacy of instructions, will take all of the instructions as a whole to ascertain if they fully and fairly cover the law. *People v. St. Pierre* (1975), 25 Ill. App. 3d 644, 650, 324 N.E.2d 226, 230.

■ Defendant's major contention seems to be that notwithstanding the jury's failure to reach a decision on the sex offense charge, the giving of this instruction was prejudicial to defendant in that the jurors may have been unfairly persuaded to convict him of aggravated battery and armed robbery because the instruction implied that she was a victim. We disagree. The definition was given in conjunction only with the sex offense charge. Additionally, the record overwhelmingly supports defendant's convictions for aggravated battery and armed robbery. Ms. V.S.'s testimony revealed that defendant commenced beating her when she was near the car; he took her purse and emptied the contents from it; then defendant beat her repeatedly in the face with his fist; she was kicked repeatedly in the face, nose, eye, jaw and ribs. Her testimony was corroborated by that of Dr. Krishna, who found that V.S. suffered multiple injuries to her face, nose and cheekbone, had blood in the nose and mouth and bruises and cuts on her legs. X rays taken of her revealed a fractured nose and a fractured cheekbone. Dr. Krishna also observed that V.S. was unable to open her left eye; her nose was swollen; blood was present in the nose and the left side of her face was swollen. Dr. Krishna opined that the injuries were consistent with being repeatedly punched and kicked and that such injuries could have been life threatening. Finally, evidence was presented which revealed that the bloodstains present on defendant's shoes were consistent with V.S.'s enzymes to the exclusion of the other people involved.

Likewise, the evidence of armed robbery of Ms. V.S. is ample in support of the jury's verdict. V.S. testified that one of the codefendants took the rings off her finger while defendant was armed with a six-inch-long blade. Her wallet and watch also were taken. E.S. testi-

fied that one of the codefendants held a knife to his throat and demanded money. Not only was money taken, but clothing, a cooler of Old Milwaukee beer and a cooler of meat. The arresting officer found defendant and his cohort to be in possession of Old Milwaukee beer upon their arrest and, finally, both victims identified defendant in a lineup.

Accordingly, in light of the principles enunciated herein, we find that the trial court's instruction defining the term "victim" was not an abuse of discretion and properly informed the jury of the correct principles of law applicable to the facts of the instant case. But assuming *arguendo* that such instruction was erroneous, in light of the overwhelming evidence as to the charges of armed robbery and aggravated battery, we deem such error to be harmless.

The final issue we are called upon to resolve is whether the defendant was denied a fair trial when the prosecutor was allowed to read into evidence a police report notation regarding an alleged statement made by defendant and when a police officer was allowed to testify that he was assigned to the special prosecutions gang unit.

Addressing the police report notation, police reports are usually not admissible in evidence. (*People v. Walls* (1980), 87 Ill. App. 3d 256, 408 N.E.2d 1056.) Generally, a police report summarizes information obtained from various sources during the course of an investigation. Consequently, they are the product of secondhand knowledge as to the reporting officer and, hence, hearsay. Our courts have repeatedly held that the use of such reports in criminal prosecutions to prove the truth of those matters asserted therein results in an almost certain "collision [course] with confrontation rights." (See generally McCormick on Evidence §316, at 891 (3d ed. 1984).) In order to protect those rights it is imperative that police officers only testify to those matters that are within their own personal knowledge. (*People v. Banasik* (1981), 93 Ill. App. 3d 612, 417 N.E.2d 790.) It is permissible, however, after the appropriate foundation is laid, to use such reports for the purpose of refreshing the recollection of the witness (*People v. Morris* (1978), 65 Ill. App. 3d 155, 382 N.E.2d 383), as evidence of past recollection recorded (*People v. Carter* (1979), 72 Ill. App. 3d 871, 391 N.E.2d 427), or for impeachment of the witness (*People v. Turner* (1963), 29 Ill. 2d 379, 194 N.E.2d 349).

In the case at bar, defendant complains of the manner of redirect examination by the State of Detective Lotito. On cross-examination, he testified that his written reports contained no reference to defendant's participation in the beating of E.S. On redirect, over the defend-

ant's objection, the State elicited the following testimony from Detective Lotito:

> "MR. TSUKUNO [Assistant State's Attorney]: Detective Lotito, I show you a one-page document now identified as People's Exhibit 35 for identification. Do you recognize that document as a part of a two-page major crime worksheet?
>
> A. It appears to be the back page of my major crime worksheet.
>
> Q. Now, in People's Exhibit Number 35 for identification, did you include within the report with reference to Edward Garrett only that Edward Garrett then said, 'Take everything. The keys and the money, and let's get the fuck out of here'?"

Defendant asserts that this testimony was offered to prove the truth of the matters asserted therein, suggested to the jury that Garrett's role in the attack on the victims was that of leader and thereby unfairly persuaded the jury to believe that defendant was accountable for the actions of his two codefendants. The significance of this, defendant maintains, was reflected by the jury's written request to the judge for clarification on the issue of accountability. He maintains that the hearsay testimony may well have been a decisive factor in the jury's verdict. Finally, as to this issue defendant urges that the erroneous manner of redirect examination of Detective Lotito resulted in the improper admission of a police report into evidence, citing *People v. Wilson* (1984), 123 Ill. App. 3d 798, 463 N.E.2d 890.

■ The State denies that the use of the report was to prove the truth of the matters asserted therein, but rather was admissible to "clarify an inference" made on cross-examination. Contrary to the State's position, however, it is clear that the State read the substance of an inculpatory statement allegedly made by the defendant during the occurrence. It would have been sufficient and appropriate to elicit from Detective Lotito that his report did make reference to defendant's involvement in the occurrence. It was unnecessary to elicit the substance of the statement. Hence, we agree with defendant that the evidence was hearsay. Now that we have so decided, we must determine whether the admission of the evidence prejudiced defendant. The victims' testimony provided graphic details of how instrumental defendant was in the planning and execution of this attack on them. According to their testimony, from the beginning to the end, he directed them to the location of the attack under the guise of looking for his father, participated fully in the beatings inflicted upon each of them, and he took property from them. Clearly, the evidence regarding defendant's leadership role was overwhelming. Consequently, we

fail to see how the admission of the statement influenced the jury's decision. We find no prejudice by its erroneous admission and deem it to be harmless error.

■ Lastly, defendant contends that admission of Sergeant Stevens' testimony that he was assigned to the special prosecutions gang unit was reversible error. He urges that as a result of its admission, he was denied a fair trial because the evidence implied that the incident at issue was gang related. He argues that this evidence was incompetent and irrelevant, and its admission requires a reversal of the conviction and a remand for a new trial. A reviewing court will not disturb the trial court's evidentiary rulings, absent an abuse of discretion and a showing of prejudice to the defendant. (*People v. Holman* (1987), 157 Ill. App. 3d 764, 775, 510 N.E.2d 1139, 1146.) In the instant case, Sergeant Stevens testified that his duty in connection with the case was merely that of custodian of evidence. In response to a preliminary question, he identified himself and stated what his assignment was. Defense attorney moved for a mistrial predicated on Sergeant Stevens' identification of himself as a part of the special prosecutions gang unit. She alternatively requested the court to give a cautionary instruction to the jury. Both motions were denied, and the witness was then meticulously cross-examined regarding his role in the case. Specifically, the following questions were asked and answers given:

"MS. ANDERSON [Defense Attorney]: You are a special agent assigned to that office?

A. Yes.

Q. You are assigned to the Gang Prosecution?

A. Correct.

Q. You're here to testify today solely as a custodian being you watched blood being drawn from certain characters?

A. Yes.

\* \* \*

Q. Other than being present at the time of the drawing, the extraction of blood, that was your only role here, correct.

A. Correct.

\* \* \*

Q. Your particular role in gang prosecution has no relevance to this case, isn't that right? You were there to oversee that the blood was properly drawn?

A. Correct."

Defendant analogizes Sergeant Stevens' testimony to that of the prosecutor in *People v. Blissitt* (1973), 12 Ill. App. 3d 551, 299 N.E.2d

562, wherein the prosecutor testified that after speaking to the police officers who investigated the case, he recommended that defendant be charged with murder. We held that implicit in that testimony was the prosecutor's belief regarding the guilt of the defendant. (*Blissitt*, 12 Ill. App. 3d at 554, 299 N.E.2d 563.) We find *Blissitt* distinguishable from the case at bar. Sergeant Stevens did not discuss in any detail what his duties were and he never expressed any opinion or belief regarding the facts of this case. His sole function in the case was as custodian of certain physical evidence. We deem the preliminary question regarding his assignment to be an innocuous part of the foundational requirements for admission of the physical evidence. We find no prejudice to the defendant by virtue of its admission nor do we find error in the court's refusal to give a limiting instruction.

For the foregoing reasons, this court affirms in part and vacates in part the judgment of the circuit court of Cook County.

Affirmed in part; vacated in part.

BUCKLEY and O'CONNOR, JJ., concur.