THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRIAN FRAMPTON, Defendant-Appellant.

First District (2nd Division)   No. 1—92—1767

Opinion filed June 8, 1993.

Frederick F. Cohn, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Laura L. Morrison, and William M. Traynor, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Defendant was convicted by a jury of two counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—14 (now 720 ILCS 5/12—14 (West 1992))), and one count of aggravated kidnapping (Ill. Rev. Stat. 1991, ch. 38, par. 10—2 (now 720 ILCS 5/10—2 (West 1992))). He was sentenced to concurrent seven- and five-year sentences. Defendant appeals raising as issues whether (1) by limiting cross-examination, his right of confrontation and to a fair trial were denied; (2) the circuit court improperly denied him the introduction of certain evidence; (3) the court improperly allowed prosecutorial argument; and (4) due process was violated by

the court's ruling on jury instructions. We affirm, for reasons which follow.

At trial, the victim testified that she was living with her parents since one month prior to the incident at issue. She first met defendant in March of 1989, when she was 14 and defendant was 16 years of age. They married on March 6, 1991, two months following the birth of their son. At the end of May 1991, they separated. The victim moved out of the residence she shared with defendant's family and moved to her mother's home.

On July 2, 1991, while working the night shift at a restaurant, the victim received a call from defendant. She refused to speak to him because she was afraid of him. Defendant said that he was going away, he wanted to say good-bye to her and their son, and then he would leave them alone. She agreed to meet him, with friends, across the street from the restaurant at 10 p.m.

At about 10:15 p.m., the victim noticed that defendant had parked his car across the street. She asked a friend, Travis Tarant, who had just brought her child to her at work, and Tim Bambulas, the cook, to go outside with her while she talked to defendant, being afraid to meet him alone. The three exited the store. The victim approached defendant's automobile; Tarant stopped 10 to 15 feet from the car; and Bambulas waited just outside the store. When defendant alighted from his car and asked the whereabouts of their son and said that he wanted to say good-bye to him, the victim yelled for Bambulas to bring the boy outside.

After Bambulas went inside, defendant lifted up the side of his shirt and showed the victim a gun, telling her it was a loaded .22 and, if she did not go with him, he would kill her and everybody else. Bambulas was just bringing their son out of the restaurant. The victim yelled for him to bring the child back inside, which he did.

Defendant grabbed the victim's wrist, pulled her around to the passenger side of the car and pushed her inside, and he entered the driver's side of the car. As defendant started to drive away, Tarant came up to the car and asked defendant if everything was "okay and to be cool." The victim mouthed to Tarant that defendant had a gun and extended her finger and thumb to resemble a gun. Tarant told defendant not to do anything stupid. Defendant drove off with the victim in the car.

Defendant drove to the forest preserve and repeatedly told the victim that he loved her and would change for her. Defendant parked the car in the forest preserve area and, holding the hand-

gun, pulled her out of the car into the woods, to a nearby picnic table, where he sat and put the gun on the bench. The victim began pacing three feet away. Defendant came over to her, pushed her down, pulled down her pants and underwear and began sticking his fingers into her vagina. The gun was next to defendant. Defendant undid his pants, pulled them down and began having intercourse, saying that he "had to make love to [her] one last time." The victim kept saying, "Please stop. Do not do this to me." Defendant would not stop. He undid her shirt and slid his hand under her bra. Defendant started having oral sex. The victim kicked him a couple times, and he then started having intercourse again. When the victim started screaming, defendant put his hands over her mouth and said that he would kill her if she continued. She was crying. Defendant ejaculated, stood up, pulled up his pants and picked up the gun. The victim put on her pants, took off her bra and left it there so someone would believe her. Defendant, saying that he was sorry and that he had to do it, told her to walk back to the car.

After arriving at the car, defendant told her that if she did not want to see him leave, she should leave. The victim started running away, but defendant ordered her to stop or he would shoot. When she stopped and turned around, she saw defendant pointing the gun at her. The victim walked back to defendant, who shoved her back inside the passenger side of the car and drove to his stepfather's house. Defendant told her he wanted to make a fresh start and that he wanted to pick up his son so he could go away. The victim responded that he could not pick up their son until he dropped off the gun, to which defendant agreed.

At the stepfather's house, the two exited the car and defendant again tucked the gun inside his waistband and then knocked on the door. When his stepfather answered, defendant asked for money so that he and the victim could go away and make a fresh start. The victim agreed to go with him to avoid being hurt again.

A police car passed and came back. Defendant gave the gun to his stepfather and asked him to put it in the house so that he would not get into trouble. The victim and defendant walked to the police car. The victim yelled that defendant raped her. Defendant fled and the officer caught him. The officer retrieved the gun from the house. The victim identified the gun in court.

On cross-examination, the victim testified that she divorced defendant about two weeks prior to trial. In addition to telling her that he was going to kill her while in the forest preserve, defendant threatened to kill himself. The victim denied saying one word to

defendant while riding from the forest preserve to defendant's stepfather's house or when defendant asked the stepfather for money. Defense counsel sought to introduce into evidence, through cross-examination of the victim, the alleged fact that three months following the incidents which were the subject of this trial, and while defendant was awaiting trial, the victim had sought to obtain a gun in order to harm defendant. The State objected and defense counsel then requested a sidebar. Immediately upon resuming trial, defense counsel withdrew the question.

Tarant testified and corroborated the victim's testimony.

Sergeant Mike Pulec testified that on July 2, 1991, while on patrol, he received a report of the abduction with defendant identified as the offender. Pulec proceeded to defendant's stepfather's house. There, he observed defendant's car in the driveway, which he radioed in, and drove past the house. When he saw defendant and the victim on the porch, he parked and asked defendant to approach the car. The victim yelled "he raped me." Defendant ran and Pulec apprehended him.

The officer spoke with the victim and asked the stepfather for the gun. The stepfather gave him a .22-caliber long rifle target pistol. The officer identified the gun in court.

The State rested.

The defense called Linda Stuebe, defendant's mother, who testified that defendant and the victim had been living together in her house from March of 1991 until the victim moved out in May of 1991. On July 2, 1991, at about 5 p.m., the victim called her at work and asked if she could keep the baby that night, to which she had responded affirmatively. She took the baby from the victim's mother's residence on the way home. At 7:30 or 8 p.m., Tarant picked up the child to be taken to the victim.

The stepfather, Robert Stuebe, testified and corroborated the events and conduct previously attributed to him.

Defendant testified that he was married to the victim and had shared one child with her. On Memorial Day weekend of 1991, the victim told him that she had wanted to end the relationship and move out. Defendant then told her that he did not want that to happen. He believed that she had been seeing a friend of his.

On July 2, 1991, Tarant came by the Stuebe house to pick up the baby and take him to the victim. Just before Tarant arrived, defendant had a conversation with the victim, who apparently admitted that she had been sleeping with his friend. At about 10 p.m., he called and told the victim that he wanted to see her and the

baby one more time. He was going to kill himself. He had gone by the restaurant at 10:30 p.m. with the gun he had obtained from his best friend's home. The victim had gotten into his auto without being threatened with the gun. Tarant approached the car and had asked the victim if he was forcing her to leave. She said "no."

Defendant drove to the woods and had consensual intercourse with the victim. She kicked him while he engaged in oral sex. The gun was on top of the picnic table during this time, out of his reach. Defendant told the victim that he was going to kill himself, but she apparently talked him out of it, telling him that maybe they could work out their problems. He drove to his stepfather's home and asked for money. When police arrived at the house, the victim told them that "[h]e's got a gun" and "he just raped me." Defendant said "no" and ran because he was afraid.

On cross-examination, defendant admitted that he had been upset with the victim because she had been seeing someone else and that he had obtained the gun by entering a friend's home and taking it. He had asked the victim to meet him across the street from the restaurant because he had not been allowed in the restaurant under the terms of a previous order of protection, which was entered when he battered the victim previously.

Defendant rested.

Defendant was convicted and sentenced as earlier mentioned.

I

Defendant contends that the circuit court erred in prohibiting defense counsel from demonstrating the bias and motive of the victim to lie against him, limiting cross-examination on issues that would so demonstrate, and precluding the defense from presenting evidence to contradict and impeach the victim.

In his attempt to establish that the victim was framing him in order to ensure that she had full custody of their son, the circuit court is asserted to have erroneously excluded highly relevant information, by the court's refusal to allow defense counsel to introduce evidence through cross-examination of the victim that three months following the incident, while defendant awaited trial, she sought to obtain a gun in order to harm defendant.

During cross-examination of the victim, defense counsel asked:

"Last fall, after the July two incident, and after you filed your divorce suit in October 1991, did you ask a person in the presence of Travis to see if he could get a gun to kill [defendant]?"

Outside the presence of the jury, the circuit court found that this question constituted impeachment on a collateral issue and that the question may be asked, but "you have to take the answer." The court was willing to allow *voir dire* of Travis, the alleged witness to the victim's statement, outside the presence of the jury. Upon resuming trial, however, defense counsel withdrew the pending question. The State asserts that this withdrawal, and failure to raise the question again at trial or in post-trial motion, constitutes waiver. We elect to consider the issue on its merits. 134 Ill. 2d R. 615(a).

■■ The sixth amendment confrontation clause does not prevent a circuit court from imposing reasonable limits on defense counsel's inquiries into the potential bias of a State's witness. (*People v. Harris* (1988), 123 Ill. 2d 113, 526 N.E.2d 335.) The court retains wide latitude and discretion to impose reasonable limits on such cross-examination based on such concerns as harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or of little relevance. (*Harris*, 123 Ill. 2d at 144.) The issue is whether defendant's inability to inquire created a substantial danger of prejudice by denying his right to test the truth of the witness' direct testimony. (*Harris*, 123 Ill. 2d at 145.) A reviewing court will not interfere, absent a clear abuse of discretion which results in manifest prejudice to defendant. (*People v. Collins* (1985), 106 Ill. 2d 237, 269, 478 N.E.2d 267.) Further, the cross-examiner may not impeach a witness on collateral matter, that is, whether the matter could be introduced for any purpose other than to contradict. (*Collins*, 106 Ill. 2d at 269.) Whether a matter is collateral is an issue essentially determined by the circuit court. (*Collins*, 106 Ill. 2d at 270.) Here, the proposed evidence was clearly collateral because it did not contradict the victim's testimony or relate to any issue before the court. The alleged subsequently developed hostility was not relevant to whether defendant's actions were permitted by consent. Moreover, defense counsel withdrew his pending question to the victim and, therefore, the cross-examination was never barred.

Defendant claims that the court improperly prevented him from demonstrating that the victim's bias against him was caused by her desire to have him out of her life so she could continue her affair with another man. The record demonstrates, however, that defense counsel was permitted to establish that the victim was involved with another man, including the solicitation from Tarant of the victim's boyfriend's name on July 2, 1991. Defendant himself testified that the victim allegedly admitted to sleeping with a boyfriend.

The jury was adequately informed of any potential bias of the victim against defendant. There was no error.

## II

Defendant maintains that his right to a fair trial was violated by the introduction of evidence that another judge had issued an order of protection and by the prosecutor's argument.

During the cross-examination of defendant, he asserted that he was not allowed to enter the restaurant's parking lot because of a previous court order of protection, which was entered after he was charged with the battery of the victim. Defendant had violated the order. The prosecutor in final argument, stated:

"The law now allows women to go and obtain these orders of protection so that they can be protected from exploitative and manipulative men and I submit to you that's what this defendant is.

Well, the evidence in this case is that you know [the victim] got one of those. You know that there was a battery committed upon her on May 28, 1991, and she then came to the Circuit Court of Cook County, to this very courthouse, and obtained an Order of Protection. That's an order from a judge, from the Circuit Court of Cook County, from the State of Illinois ordering you [to] stay away, you're not to have any contact with this woman, none, and he violated it."

Defendant avers that the foregoing argument was most prejudicial, because the jury was advised that defendant was violent, the victim's life was in danger from defendant, and that it was necessary for the court to order defendant not to hurt or injure his wife, which was equivalent to the jury being advised that a court had ruled adversely to defendant on an issue before the jury. Defendant adds that this was plain error and, because the evidence allegedly was not overwhelming, the prejudice to defendant requires reversal.

The State responds that because defendant did not object or raise its objection in the post-trial motion, this issue is waived. The State also avers that plain error does not exist because the evidence was not closely balanced and any error was not of such magnitude to deny defendant a fair trial. Further, the State maintains, because defendant claimed that the victim consented, evidence of the protection order and defendant's actions were relevant to show the presence of intent and absence of consent. The prosecutor's comments or arguments constitute prejudicial error where the jury would have reached a contrary verdict had the improper remarks

not been made. (*People v. Manley* (1991), 222 Ill. App. 3d 896, 584 N.E.2d 477.) In this case, Tarant's testimony that the victim asked him to go with her to meet defendant to prevent any problems; Tarant's testimony that he saw defendant grab and push the victim into the car; Tarant's knowledge that defendant had a gun; the stepfather's testimony that defendant gave him the gun; defendant's testimony that he was upset that the victim was seeing someone else; defendant's testimony that the victim told Bambulas to put their son back in the restaurant; and defendant's admission that the victim kicked him while he engaged in oral sex are overwhelming evidence of defendant's guilt. It is highly unlikely that the jury would have reached a contrary verdict absent the questioned argument. There was no error.

### III

Defendant asserts that due process was violated when the court's instruction allegedly removed from the jury's consideration the crucial issue, whether the victim consented to the sexual act.

Over defendant's objection, the court instructed the jury:

"The word 'consent' means a freely given agreement to the act of sexual penetration in question. Lack of verbal or physical resistance or submission by the victim resulting from the use of force or threat of force by the defendant shall not constitute consent."

Defendant contends that this instruction is prohibited because it removed from the jury the issue of consent and required the jury to find lack of consent, irrespective of the totality of the evidence, if there was some force or threat of force of some nature and was the equivalent of a directed finding. (*Sandstrom v. Montana* (1979), 442 U.S. 510, 523, 61 L. Ed. 2d 39, 50, 99 S. Ct. 2450, 2458-59.) Further, it is urged, the instruction is a prohibited mandatory presumption which directs the jury to infer a presumed fact if the State proves certain predicate facts.

The instruction complained of was taken almost verbatim from section 12–17 of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 12–17 (section 12–17)), and accurately tracked Illinois Pattern Jury Instructions, Criminal, No. 27.03 [11.63A] (3d ed. 1992). An instruction such as this is to be used unless the circuit court determines that the instruction does not accurately state the law, which was not the case here. 134 Ill. 2d R. 451(a); *People v. Garrett* (1991), 216 Ill. App. 3d 348, 576 N.E.2d 331.

██ The challenged instruction did not create a mandatory presumption in any event, since the instruction left to the jury's judgment the determination of whether the victim's submission resulted from the use of force or threat of force, or not. There was no error.

## IV

As his final contention, defendant urges that he was denied due process when the circuit court refused his instruction on the lesser included offense of unlawful restraint, insisting that the jury could have believed part of his testimony and part of the victim's testimony and, therefore, could have rejected the greater offense of aggravated kidnapping and found that the lesser offense of unlawful restraint existed.

Unlawful restraint is a lesser included offense of aggravated kidnapping, in that all of the elements of unlawful restraint are included in aggravated kidnapping. (*People v. Bell* (1991), 217 Ill. App. 3d 985, 577 N.E.2d 1228.) Limits upon the operation of the included-offense doctrine include whether the evidence permits a jury rationally to find defendant guilty of the lesser offense and to acquit him of the greater. (*People v. Bryant* (1986), 113 Ill. 2d 497, 507, 499 N.E.2d 413.) Instructions on less serious offenses are not required in every case. Where the evidence shows that defendant is either guilty of the greater offense or not guilty of any offense, an instruction on the lesser-included offense is unnecessary and properly refused. *People v. Moore* (1990), 206 Ill. App. 3d 769, 774, 565 N.E.2d 154.

██ The evidence received in the case *sub judice* demonstrated that defendant was either guilty of aggravated kidnapping or not guilty of any offense. Defendant was armed with a weapon during the entire time the victim was secretly confined, throughout the incident, not just when she entered his car as he suggests. If found guilty, defendant committed aggravated kidnapping, which has the element of acting while armed with a dangerous weapon. Were defendant's version to be believed, he was not guilty of any unlawful restraint, since she is alleged to have consented to everything. Aggravated unlawful restraint, not unlawful restraint, has the element of using a deadly weapon. The circuit court stated in this regard:

> "I would consider giving aggravated unlawful restraint because it's not disputed that a weapon was involved in this case, and the dispute is to what the weapon was going to be used for."

We find no error in the circuit court's refusal of defendant's proposed lesser included offense instruction.

Defendant has demonstrated no bases upon which to interfere with the jury's verdict rendered in this case. Accordingly, his convictions and sentences must be affirmed. .

Affirmed. ·

McCORMICK, P.J., and DiVITO, J., concur.