2021 IL App (1st) 181227

No. 1-18-1227

Opinion filed March 11, 2021

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit |
| | ) | Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 16 CR 17130 |
| | ) | |
| ERNEST REYNOLDS, | ) | Honorable |
| | ) | Thomas V. Gainer, Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justice Martin concurred in the judgment and opinion.
Presiding Justice Gordon concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1     Following a jury trial, defendant Ernest Reynolds was convicted of one count of attempted

first degree murder, two counts of aggravated criminal sexual assault, and one count of aggravated

battery, all arising from an attack on his then-girlfriend, T.J.[1] The trial court sentenced defendant

to consecutive prison terms of 12 years on the attempted murder conviction and 16 years on each

_____

[1]As is common practice in cases involving sex offenses, we refer to the victim by her initials to
protect her privacy. See *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 1 n.1.

of the aggravated criminal sexual assault convictions, with a concurrent term of four years on the aggravated battery conviction.

¶ 2    On appeal, defendant contends that the evidence was insufficient to prove that he intended to kill T.J., as required to support a conviction for attempted first degree murder. He also argues that the trial court erred in admitting audio recordings of two jail calls attributed to him because the State failed to lay an adequate foundation to authenticate the recordings, and that the trial court usurped the jury's factfinding role by instructing the jury that defendant made the calls. Finally, defendant argues that the trial court erred when, in response to the jury's request to listen to the jail calls during deliberations, it brought the jurors back to the courtroom and played the calls for them in the presence of the judge and the parties.

¶ 3    For the following reasons, we vacate defendant's attempted first degree murder conviction, affirm his remaining convictions, and remand for the trial court to impose a consecutive sentence on the aggravated battery conviction.[2]

¶ 4                                I. BACKGROUND

¶ 5    At trial, T.J. testified that she had gone to Elkhart, Indiana, on October 13, 2016, to look for housing in anticipation of relocating for work. She was accompanied by her friend, Randy. When she and Randy returned to Chicago around 5 p.m., Randy dropped her off at her mother's house near 95th Street and South Woodlawn Avenue. While there, T.J. received two phone calls from defendant, whom she had been dating for about two months. Defendant later came to T.J.'s mother's house and knocked on the door, but T.J. did not answer, and defendant left. About 20

---

[2]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

minutes later, defendant returned and knocked again, and this time T.J. came outside to talk to him. She asked defendant to drive her to a liquor store, which defendant did. Defendant and T.J. then returned to T.J.'s mother's house, and defendant parked his truck in the garage behind the house.

¶ 6 Defendant and T.J. stayed in the garage and talked for several hours, while drinking and smoking marijuana. T.J. also smoked crack cocaine. During their conversation, defendant asked T.J. if she was cheating on him, and T.J. said she was not. Around 10 p.m., T.J. decided to call it a night. She told defendant she was going inside, but defendant told her to get back in the truck. T.J. got in the passenger seat as directed, and defendant drove away.

¶ 7 As defendant drove, T.J. began to doze off and eventually fell asleep. When she woke up around 3 a.m., defendant was on top of her and had his penis in her mouth. T.J. told defendant to get off and tried to push him away. Defendant got off of T.J. for a brief moment, retrieved a box cutter from the truck's center console, and got back on top of her. T.J. tried to look around to see where they were, but defendant told her to look at him. Defendant then spit on and smacked T.J.'s face several times. He told her he was going to torture her, slit her throat, and kill her. Defendant then hit T.J. in the face numerous times using the blunt end of the box cutter. While doing so, he said that T.J. had been cheating on him with Randy and Deondra, her roommate. T.J. testified that defendant hit her with the box cutter close to 100 times, causing her face to go numb.

¶ 8 Defendant then grabbed T.J.'s neck with one hand and began to choke her, as he held the box cutter in his other hand. T.J. told defendant she could not breathe, and defendant simply said, "I know." After a minute or two, defendant let go of T.J.'s neck. He asked her if she had cheated on him and whether she "was going to take the lie to the grave with [her]." About two minutes

later, defendant began to choke T.J. again. He repeated this process three times. While being choked, T.J. was gagging and could not breathe, and her neck and throat hurt. Defendant again told T.J. that he was going to kill her.

¶ 9      Defendant then grabbed T.J. by the hair, pulled her head back, and held the blade of the box cutter to her neck. He pressed the blade against T.J.'s neck and dug into her skin, cutting her. He told T.J. he was going to slit her throat. Fearing for her life, T.J. exclaimed "wait, wait, wait." Defendant then removed the blade from T.J.'s neck and again asked if she had cheated on him. When T.J. did not respond, defendant put the blade back to her neck.

¶ 10      At some point, defendant removed the box cutter from T.J.'s neck and told her to perform oral sex on him. He placed the box cutter on the center console and got into the driver's seat. T.J. complied with his demand and began to perform oral sex on him. After a few minutes, defendant told her to stop because he was not getting aroused. He then said he wanted to have sex, so T.J. pulled down her pants and defendant climbed on top of her in the passenger seat. He inserted his penis into her vagina and "grind[ed] on top of [her]." He stopped after about five minutes because he again was unable to get an erection.

¶ 11      After defendant returned to the driver's seat, T.J. realized that she had urinated on herself during the ordeal and told defendant that she had to use the bathroom. Defendant exited the truck and walked around to the passenger side. As he did so, T.J. climbed across the seats and escaped through the driver's side door. At that point, T.J. realized that they were in a church parking lot. Defendant chased T.J. around the truck and eventually caught her. He told T.J. to get back in the truck, and she complied. When defendant got back in the driver's seat, he said "It's about time."

He told T.J. that he was going to take her to an alley and leave her body there. He said he had to kill her because if he let her go, she would call the police.

¶ 12    Defendant pulled out of the church parking lot and drove away. As he started to turn into an alley, T.J. opened the passenger door and tried to jump out. Before she made it completely out, however, defendant grabbed her by the arm. As she dangled halfway out of the truck, she was dragged down the alley. She was able to slip out of defendant's grasp when her jacket came off. She fell out of the truck, hit the ground, and had her leg run over by the truck. Despite intense pain, T.J. was able to get up and run away limping. In the process, one of her shoes came off, but she continued without it. She made it to a nearby fire station and knocked on the door. When a man responded, she told him that her boyfriend was trying to kill her.

¶ 13    T.J. was then taken by ambulance to a hospital. She had a fractured nose, multiple cuts and bruises on her face, neck, and behind her ears, and multiple bruises and abrasions on her legs and stomach. Her face and neck were swollen, and she had two black eyes. She received stitches to her arm and the inner part of her upper lip. She remained at the hospital for three to four hours and was given pain medication upon release. She testified that her throat hurt for three weeks after the attack, making it difficult for her to talk or swallow. She received follow-up care for an infection to her foot and ankle. She also testified that she has permanent scars on her hip, stomach, and leg.

¶ 14    While she was at the hospital, T.J. spoke with a police officer, who photographed her injuries. On October 15, 2016, the following day, T.J. informed the police that defendant's truck had been spotted in the vicinity of the church parking lot. On October 16, 2016, T.J. spoke with a detective. That same day, defendant contacted T.J., and they arranged to meet at a grocery store. Police officers accompanied T.J. to the store and took defendant into custody.

¶ 15    T.J. also testified about a prior incident involving her and defendant, which was admitted to show defendant's intent and state of mind. T.J. testified that defendant was at her apartment on October 6, 2016, when he made a comment about her cheating on him and told her that he would "smash [her] body through [the] wall and put [her] body inside the alley."

¶ 16    Dwayne Holder, a firefighter, testified that he was on duty around 4 a.m. on October 14, 2016, when someone began pounding on the fire station door. When he opened the door, he saw T.J. She had a swollen eye and "busted," swollen lips. Her shirt was disheveled, her pants were partially open and unzipped, and she had only one shoe. T.J. told Holder that she had been beaten and thrown from a car by her boyfriend. Holder called the police, and paramedics at the fire station attended to T.J. before she was transported to the hospital.

¶ 17    Detective Jerome Malkowski testified that, when he spoke with T.J. on October 16, 2016, he observed marks on her face and neck and a cut on her arm. Her eyes and lips were swollen and one eye was bloodshot. He also noticed that T.J. walked slowly and with a limp and had difficulty speaking. Detective Malkowski testified that during a search of defendant's truck, officers found T.J.'s wallet, one of her shoes, and a key fob for her mother's car. They also recovered a box cutter in the center console of the truck.

¶ 18    The State's final witness was Kimberly Hofsteadter, an investigator with the Cook County Department of Corrections, who testified about two phone calls that defendant made while he was in pretrial custody. Prior to her testimony, the court instructed the jury that Hofsteadter was going to testify that defendant "was involved in conduct other than conduct charged in the indictment" and that the evidence was "being offered on the issue of the defendant's consciousness of guilt and may be considered by you only for that limited purpose." The court also instructed the jury that it

"is for you to determine whether the defendant was involved in the conduct" and "if so what weight should be given to the evidence on the issue of consciousness of guilt." Finally, the court explained to the jury that:

"What you are about to hear are calls that the investigator will identify as being made by the defendant from the Cook County Department of Corrections. The fact that these calls were made by the defendant from the Cook County Department of Corrections must not be considered by you in any way in arriving at your verdict. That is, the fact that he was in the jail."

¶ 19 Hofsteadter testified that she is responsible for fulfilling subpoena requests for telephone records at the Cook County jail. She was trained in the use of the jail's inmate phone system, which is provided and maintained by both the Cook County Sheriff's Office and a private company called "Securist." Her training included instruction in how to listen to inmate phone calls and retrieve those calls from the system.

¶ 20 Hofsteadter testified that inmates who use the system are notified that their calls will be monitored and recorded. To make a call, an inmate is required to give his name and his personal identification number (PIN) before dialing the number he wishes to call. The phones available for inmate use are landline phones affixed to the walls in the living areas of the jail. When an inmate places a call, the system records the PIN associated with the call and the location in the jail from which the call originated. Hofsteadter explained that the system allows inmates to make outgoing calls only. Inmate phone calls are supposed to be restricted to a single recipient, but Hofsteadter acknowledged that that was not always the case in practice.

¶ 21 Hofsteadter testified that she received a subpoena from the State for jail calls made by defendant between October 16, 2016, and December 21, 2016. To respond to the request, she generated a call detail report and a housing assignment report for defendant with respect to the time period requested. Call detail reports show the inmate name and PIN associated with a call, the location of the phone from which the call was made, the phone number dialed, the duration of the call, and how the call ended. A housing assignment report lists an inmate's living unit and cell number and the period during which the inmate was assigned to a particular location. Hofsteadter explained that the Cook County Department of Corrections keeps call detail reports and housing assignment reports in the ordinary course of business.

¶ 22 Hofsteadter testified that she reviewed the call detail report and housing assignment report that she generated in response to the subpoena. She also reviewed the phone calls requested in the subpoena. The State introduced unredacted and redacted versions of both reports as exhibits, which Hofsteadter identified as true and accurate copies of the respective reports. The unredacted call detail report lists 31 calls associated with defendant's name and PIN between the dates requested in the subpoena. The redacted call detail report shows two of those calls, with the remaining calls blacked out. The first call identified on the redacted call detail report was placed on October 22, 2016, at 4:44 p.m., and lasted for 13 minutes. The second call was placed on October 24, 2016, at 9:36 a.m., and lasted for 30 minutes. Both calls were made to the same phone number.

¶ 23 The State also introduced two CDs as exhibits. Hofsteadter identified the first CD, marked as People's Exhibit 27A, as the disc that she previously gave the State containing all of the calls requested in the State's subpoena. She identified the second CD, marked as People's Exhibit 27B, as a disc containing shortened portions of the two calls identified in the redacted call detail report.

She testified that the files in People's Exhibit 27B were true and accurate copies of the portions of the original calls contained in People's Exhibit 27A.

¶ 24    The State then published People's Exhibit 27B to the jury. The first recording on the disc is two minutes and 37 seconds long. It begins with an automated voice stating that "this is a prepaid collect call from," followed by a man saying the words "Ernest Reynolds." An automated voice then states that the call is being placed by an inmate at the Cook County Department of Corrections, provides several warnings to the recipient, and advises that the call is subject to monitoring and recording. A conversation then ensues between a man and an unidentified woman. The man states that he is angry and says, "Y'all need to be doing something on the outside." The woman responds that she is not going to "discuss [that] over the phone." The man says that he "don't care about no phone" and that he will "get out there and kill that b*** and her people." The woman tells the man to "just believe that I'm taking care of everything." The recording then appears to skip forward in the conversation. The woman asks, "Did you tell him?" The man says, "No, I ain't told him. He gone." The woman then asks the man for his identification number, and the man says it is 2016-1019-118. (The parties stipulated that this is defendant's Cook County Department of Corrections booking number. It is also the number listed as defendant's PIN on the call detail reports.) The woman also asks the man if they have his name spelled "E-R-N-E-S-T," and the man says yes.

¶ 25    The second recording is one minute and 52 seconds long. It does not include an automated message indicating the name of the inmate who placed the call. But based on the speakers' voices, it appears to be a conversation between the same man and woman as in the first recording. The man asks the woman, "Do you think it would be best for her to come to court and just have them drop the charges?" The woman says yes. The man then asks, "What if the State don't let her drop

them?" The woman says it does not matter because the State would not have a cooperating witness. The woman says that "she gave a statement" but "not a signed statement." The man responds that the statement can still be used against him.

¶ 26     On cross-examination, Hofsteadter acknowledged that an inmate can initiate a call by giving his name and PIN and dialing a number and then hand the phone to another inmate. She also acknowledged that she did not know defendant and was not familiar with the sound of his voice.

¶ 27     After the jury commenced its deliberations, the parties and the trial court discussed how they would proceed if the jury requested to listen to the jail calls again. The prosecutor explained that the audio files were in a format that could only be played on a laptop computer, and that no "clean" laptop (meaning one that did not contain information to which the jury should not be exposed) was available to send into the jury room. The court stated that, if the jury asked to listen to the calls, the jurors would be brought to the courtroom for that purpose. Neither side objected to that proposed course of action.

¶ 28     As expected, the jury sent a note during deliberations requesting to listen to the jail calls. And as contemplated, the court brought the jury back into the courtroom. The court explained to the jury that this procedure was necessary due to the formatting of the disc. The court told the jurors that they could listen to the calls as many times as they wanted and that the court would adjust the volume at their request. The court also advised the jury that "we are not allowed to interact with you while you're deliberating." The jurors listened to the first call twice and the second call once and then returned to the jury room to continue deliberations.

¶ 29    The jury later returned guilty verdicts on all counts. The trial court denied defendant's motion for a new trial and sentenced him as described above. Defendant then filed a timely notice of appeal.

¶ 30                                          II. ANALYSIS

¶ 31                                 A. Sufficiency of the Evidence

¶ 32    Defendant's first argument on appeal is that he was not proven guilty of attempted first degree murder beyond a reasonable doubt because the evidence did not establish that he intended to kill T.J.

¶ 33    When considering a challenge to the sufficiency of the evidence, our task is not to reweigh the evidence, reassess questions of witness credibility, or substitute our judgment for that of the factfinder. *People v. Hardman*, 2017 IL 121453, ¶ 37. Instead, we must view the evidence in the light most favorable to the State, draw all reasonable inferences from the evidence in the State's favor, and ask whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *People v. Newton*, 2018 IL 122958, ¶ 24. We will vacate a conviction under this standard only if the evidence is so unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Id.*

¶ 34    To secure a conviction for attempted first degree murder, the State must prove that the defendant performed an act that constituted a substantial step toward the commission of first degree murder and that the defendant did so with the specific intent to kill the victim. *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52. Because intent is a state of mind, it will rarely be shown with direct evidence. *People v. Williams*, 165 Ill. 2d 51, 64 (1995). Instead, a defendant's intent to kill may be inferred from the surrounding circumstances, including the character of the

attack, the use of a deadly weapon, and the nature and extent of the injuries inflicted. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 59.

¶ 35    At the outset, we must address defendant's contention that the State was required to prove that he acted with the intent to kill T.J. when he strangled her and that we may not consider the evidence of his other actions when assessing his intent because the indictment specifically alleged that he committed the offense of attempted first degree murder when, "with intent to kill, [he] did an act, to wit: strangled T.J., which constituted a substantial step towards the commission of first degree murder." This argument is mistaken. The means used to accomplish death is not an essential element of first degree murder. *People v. Coleman*, 49 Ill. 2d 565, 571 (1971). Likewise, the "only required elements in an attempted murder indictment are the attempt to kill and the specific intent to commit murder, while the manner in which [the] defendant[ ] took a substantial step toward the commission of the crime is surplusage." *People v. Reynolds*, 178 Ill. App. 3d 756, 764 (1989). Because "[a] variance between the facts alleged and the proof is not fatal if the facts in question are not essential elements of the offense charged" (*People v. Meras*, 284 Ill. App. 3d 157, 164 (1996)), the State was not required to specifically prove, and we are not limited to assessing whether the evidence specifically established, that defendant intended to kill T.J. when he strangled her, as opposed to when he committed any other acts constituting a substantial step toward the commission of first degree murder.

¶ 36    Even still, we conclude that the evidence was insufficient to prove beyond a reasonable doubt that defendant intended to kill T.J. Viewed in the light most favorable to the State, the evidence showed that defendant hit T.J. in the face multiple times with the blunt end of a box cutter, grabbed her neck with one hand and choked her intermittently, and pressed the blade of the

box cutter against her neck and dug into her skin, all while repeatedly threatening to kill her. The attack left T.J. with a broken nose, two black eyes, swelling to her face and neck, and multiple cuts and bruises on her face, neck, and behind her ears. She also suffered multiple bruises and abrasions on her legs and stomach when she jumped out of defendant's truck and was run over trying to escape. She was taken to a hospital, where she received stitches to her lip and arm. She was released after three or four hours and was given pain medication. For several weeks following the attack, T.J. experienced pain in her throat and had difficulty speaking and swallowing.

¶ 37 The facts here are comparable to those in *People v. Thomas*, 127 Ill. App. 2d 444 (1970), *People v. Jones*, 184 Ill. App. 3d 412 (1989), and *People v. Garrett*, 216 Ill. App. 3d 348 (1991), cases in which, despite violent assaults and threats to kill, this court concluded that the evidence was insufficient to support findings that the defendants intended to kill their victims.

¶ 38 In *Thomas*, the defendant entered the victim's apartment and attacked her. *Thomas*, 127 Ill. App. 2d at 446-47. He banged the victim's head against a chest of drawers, hit her in the head and picked at her face with a knife, and struck her on the shoulder with the knife. *Id.* at 447. Throughout the attack, the defendant repeatedly threatened to kill the victim. *Id.* at 446-47. He then sexually assaulted her, stole money, and fled. *Id.* at 447. The victim suffered multiple cuts to her face and body. *Id.* On appeal, we deemed the evidence insufficient to support a conviction for attempted murder, explaining that "the opportunity for murder was such that there was insufficient proof that defendant intended or attempted to commit that crime." *Id.* at 456.

¶ 39 In *Jones*, three defendants broke into an apartment occupied by Mr. and Mrs. L and their nine-year-old daughter. *Jones*, 184 Ill. App. 3d at 415. The defendants beat Mr. and Mrs. L and sexually assaulted Mrs. L. *Id.* at 416. On appeal, we found the evidence insufficient to support

convictions for attempted murder with respect to Mr. L. *Id.* at 429-30. The evidence showed that the defendants hit Mr. L several times in the head with a gun, kicked him repeatedly, and stomped on the back of his head several times. *Id.* at 430. During the attack, the defendants threatened to kill Mr. L and his family. *Id.* Mr. L suffered a broken nose and several lacerations and was treated as an outpatient at the hospital, where he received 25 stitches. *Id.* In vacating the defendants' attempted murder convictions, we concluded that "[t]he character of the attack on Mr. L was not of the type that justifies an inference of an intent to kill." *Id.* "Although [Mr. L's] injuries were serious," we explained, "there was no evidence presented that they were life-threatening." *Id.* We also noted that the defendants possessed a gun and knife, "but did not use the knife in their attack on Mr. L" and used the gun only to beat him. *Id.* "Although Mr. L suffered serious injuries and [the] defendants threatened his life," we concluded that no rational trier of fact could have found that the defendants intended to kill him. *Id.*

¶ 40    In *Garrett*, the defendant lured E.S. and V.S. to a housing complex, where the defendant and two accomplices attacked the victims. *Garrett*, 216 Ill. App. 3d at 350-51. One of the men held a knife to E.S.'s throat and threatened to kill him if he did not hand over his money. *Id.* at 350. The men then hit E.S. and kicked him in the face, causing him to briefly lose consciousness. *Id.* at 351. E.S. lost two teeth and suffered lacerations and trauma to his face, skull, and extremities. *Id.* He received 15 stitches to his lip and was released from the hospital after four hours. *Id.* Relying on *Thomas* and *Jones*, we held that the evidence was insufficient to show that the defendant intended to kill E.S. so as to support a conviction for attempted murder. *Id.* at 353-54. We noted that, while the defendant was armed, he did not use the weapon against E.S. *Id.* at 354. We also noted that E.S. was treated for his injuries on an outpatient basis. *Id.* Thus, despite the defendant's

threat to kill E.S. and the "serious injuries" he inflicted, we concluded that "the character of the attack on E.S. was not of the type that justifies an inference of an intent to kill." *Id.*

¶ 41    As in these cases, the evidence here, viewed in the light most favorable to the State, was insufficient to establish beyond a reasonable doubt that defendant intended to kill T.J. Although defendant possessed a deadly weapon (the box cutter), he did not use it in a deadly fashion, such as by slashing T.J.'s throat when he had the opportunity to do so. Instead he hit T.J. in the face with the blunt end of the box cutter and later held the blade of the box cutter to her neck, digging into her skin but producing only superficial cuts. Defendant also had an opportunity to kill T.J. when he was choking her. But he instead repeatedly choked her for short periods of time before releasing her neck and asking her whether she had cheated on him. Although defendant threatened to kill T.J. numerous times, the character of the attack was more consistent with an intent to torture or terrorize T.J. into confessing that she cheated on him. The nature and extent of the injuries T.J. suffered further supports that conclusion. Although her injuries were extensive, they were not life-threatening. She was treated at the hospital for three to four hours, received stitches to her lip and arm, and was released with pain medication. Even viewed in the light most favorable to the State, this evidence was insufficient to support a finding that defendant intended to kill T.J.[3]

¶ 42    Three cases cited by the State are distinguishable. In *People v. Maxwell*, 130 Ill. App. 3d 212, 213 (1985), the defendant and an accomplice attacked an elderly man who was working alone in an office. The victim was struck in the head repeatedly with the leg of a broken chair, resulting

---

[3]The State argues that defendant used his vehicle as a deadly weapon when he ran over T.J. after she jumped out of the truck. But even viewed in the light most favorable to the State, the evidence does not support an inference that defendant intentionally ran over T.J. For the same reason, the injuries T.J. suffered when she fell from the truck and was run over—such as the bruises, abrasions, and scars on her leg and stomach and the subsequent infection to her foot and ankle—are not probative of defendant's intent.

in substantial internal bleeding on the brain. *Id.* Several hours later, while hospitalized, the victim's heart stopped beating and he entered a state of clinical death, before being resuscitated. *Id.* at 213-14. In affirming the defendant's conviction for attempted murder, we held that the manner in which the defendant wielded the chair leg as a weapon and the nature and extent of the injuries the victim suffered supported a finding that the defendant intended to kill the victim. *Id.* at 216-17.

¶ 43 In *People v. Scott*, 271 Ill. App. 3d 307, 309 (1994), the defendant entered a store, asked an employee about a product, and then punched the employee in the face. He then beat the victim until she lost consciousness. *Id.* The victim's eyes were swollen shut, her face was severely beaten and swollen, and she suffered facial lacerations that required surgical repair. *Id.* at 310. She was hospitalized for 22 days. *Id.* Although her injuries were not life-threatening, she was unable to walk without assistance for months due to a lack of balance resulting from her severe head injuries. *Id.* In affirming the defendant's conviction for attempted murder, we concluded that, given the defendant's "size and strength" and the "extreme and extended beating inflicted upon" the victim, a rational jury could find that the defendant acted with the intent to kill the victim. *Id.* at 312.

¶ 44 In *People v. Rolfe*, 353 Ill. App. 3d 1005, 1007 (2004), the defendant attacked his estranged wife, her mother, and her paramour with a claw hammer and knife. His mother-in-law suffered a depressed skull fracture so severe that bone fragments pressed into her brain, requiring surgeons to remove part of her brain and insert plates and screws to repair her skull. *Id.* His estranged wife's paramour suffered multiple facial fractures, a depressed skull fracture, and multiple stab wounds and spent eight days in an intensive care unit followed by 14 days in a rehabilitation unit. *Id.* at 1008. The defendant's estranged wife's injuries were less extreme (because the attack on her was interrupted by a neighbor), but she still suffered multiple scalp lacerations and a fractured jaw,

which required two surgeries to repair and resulted in "marked disfigurement and a threat to her health." *Id.* at 1008-09. In affirming the defendant's three attempted murder convictions, we held that "[t]he shocking injuries and the ferocity with which the defendant inflicted those upon his victims were such that no sane adult would have engaged in such brutality or inflicted such injuries unless he intended to extinguish their lives." *Id.* at 1013.

¶ 45    In each of these cases, the character of the attack and nature and severity of the injuries inflicted supported an inference that the defendant had the intent to kill. In contrast, the evidence here, including the character and circumstances of defendant's attack on T.J. and the nature and extent of the injuries T.J. suffered, was insufficient to prove beyond a reasonable doubt that defendant intended to kill T.J., even when the evidence is viewed in the light most favorable to the State. Accordingly, defendant's conviction for attempted first degree murder must be vacated.

¶ 46                        B. Foundation for the Jail Calls

¶ 47    Defendant next contends that the trial court erred in admitting the audio recordings of two jail calls attributed to him because the State failed to lay a proper foundation to authenticate the recordings. A trial court's ruling on the admissibility of evidence will not be reversed on appeal absent an abuse of discretion (*People v. Pikes*, 2013 IL 115171, ¶ 12), which occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable (*People v. King*, 2020 IL 123926, ¶ 35).

¶ 48    An audio recording that is otherwise competent and relevant is admissible "if a proper foundation is laid establishing [its] authenticity and reliability." *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 48. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Ill. R. Evid. 901(a) (eff. Jan. 1, 2011). "A finding of authentication

is merely a finding that there is sufficient evidence to justify presentation of the offered evidence to the trier of fact and does not preclude the opponent from contesting the genuineness of the [evidence] after the basic authentication requirements are satisfied." *People v. Chromik*, 408 Ill. App. 3d 1028, 1046 (2011).

¶ 49    Generally, an audio recording is authenticated "when a participant to the conversation or a person who heard the conversation while it was taking place identifies the voices of the people in the conversation and testifies that the [recording] accurately portrays the conversation." *In re C.H.*, 398 Ill. App. 3d 603, 607 (2010). However, where there is no witness with personal knowledge of what the recording portrays, a sufficient foundation to admit the recording may be laid under what is known as the silent witness theory. *Viramontes*, 2017 IL App (1st) 142085, ¶ 69. Under that method of authentication, "a recording may be admitted without the testimony of a witness with personal knowledge of what the recording portrays as long as there is sufficient proof of the reliability of the process that produced the recording." *Id.*

¶ 50    This court has previously held that "a sufficient foundation may be laid [for the admission of an audio recording] by evidence as to (1) [the] capability of the device for recording; (2) [the] competency of the operator; (3) [the] proper operation of the device; (4) [the] preservation of the recording with no changes, additions, or deletions; and (5) [the] identification of the speakers." *People v. Smith*, 321 Ill. App. 3d 669, 675 (2001). Our supreme court has stressed, however, that "this list of factors is nonexclusive." *People v. Taylor*, 2011 IL 110067, ¶ 35. As the supreme court explained, "[e]ach case must be evaluated on its own and depending on the facts of the case, some of the factors may not be relevant or additional factors may need to be considered." *Id.* Regardless

of the factors employed, "[t]he dispositive issue in every case is the accuracy and reliability of the process that produced the recording." *Id.*

¶ 51    Having considered the testimony and evidence presented here, we conclude that the trial court did not abuse its discretion in finding that the State laid an adequate foundation for the recorded jail calls under the silent witness theory. Hofsteadter testified that calls made by inmates at the Cook County jail are monitored and recorded. She explained that an inmate must give his name and PIN before dialing the number he wishes to call. When an inmate places a call, Hofsteadter explained, the phone system records the PIN associated with the call, as well as additional information about the call. In particular, Hofsteadter testified that the Cook County Department of Corrections maintains call detail reports in the regular course of business that show the inmate name and PIN associated with a call, the location from which a call was made, the phone number dialed, the duration of the call, and how the call ended.

¶ 52    Hofsteadter testified that, in response to a subpoena from the State seeking calls made by defendant, she generated a call detail report and reviewed the phone calls that were responsive to the subpoena request. Through Hofsteadter, the State introduced an unredacted copy of the call detail report showing defendant's phone calls during the period specified in the subpoena, and a redacted copy of the report showing details of the two calls that the State played for the jury. The State also admitted two CDs into evidence. Hofsteadter testified that she provided the first CD to the State and that it contained recordings of all the calls responsive to the State's subpoena. She testified that the second CD, which the State played for the jury, was a disc containing shortened portions of the two calls identified in the redacted call detail report.

¶ 53 Hofsteadter's testimony sufficiently demonstrated the accuracy and reliability of the process that produced the recordings. She testified that she was trained to use the jail's inmate phone system and that her training included instruction in how to listen to and retrieve inmate phone calls from the system, which she did in this case. She also explained the process by which inmates are able to make outgoing calls, including the need to give their name and PIN, and described what details of those calls are maintained in the system. Finally, she explained that she was able to locate calls made by defendant by generating and reviewing a call detail report and that she provided the State with a CD containing audio recordings of defendant's calls within the requested time period. Hofsteadter's testimony that "she was trained to use the system *** and that the only way the jail telephone system could be activated was by the caller entering his PIN and saying his or her name" was sufficient to establish "the reliability of the process that produced the telephone recording[s]." *Sangster*, 2014 IL App (1st) 113457, ¶ 50.

¶ 54 Defendant attempts to distinguish *Sangster* on the ground that the jail employee there testified that the inmate phone system contained a voice recognition feature that would only activate an inmate's call if the voice stating the inmate's name matched the inmate's previously recorded voice. See *id.* ¶ 27. According to defendant, the existence of a voice recognition feature in the inmate phone system was central to *Sangster*'s holding that the State had laid an adequate foundation to authenticate the recorded jail calls. But we have previously explained that the existence of the voice recognition feature did "not appear [to have] factored into the [*Sangster*] court's analysis when it determined the trial court did not err" in admitting the jail calls. *Viramontes*, 2017 IL App (1st) 142085, ¶ 72. Moreover, as noted, no single fact should control the foundation inquiry. Instead, "[t]he dispositive issue in every case is the accuracy and reliability of

the process that produced the recording." *Taylor*, 2011 IL 110067, ¶ 35. Even without testimony that the phone system here employed a voice recognition feature similar to the one in *Sangster*, the totality of the evidence presented by the State sufficiently demonstrated the accuracy and reliability of the process that produced the recorded jail calls.

¶ 55 Defendant also argues that the State failed to lay a sufficient foundation to authenticate the jail calls under the silent witness theory because it offered no testimony or evidence regarding the capability of the recording device, the competency of the individual who operated it, or whether the device was operating properly when the calls were made. But "the fact [that] the audio recording[s] exist[ ] at all demonstrates [that] the system was acting correctly." *Viramontes*, 2017 IL App (1st) 142085, ¶ 71 (citing *Taylor*, 2011 IL 110067, ¶ 39). The existence of the recordings similarly establishes the capability of the recording device and the competency of its operator. See *Taylor*, 2011 IL 110067, ¶ 39 ("As one court has stated, '[t]he fact that the tape[ ] exist[s] at all is evidence that the tape recorder was functional and that [the operator] knew how to operate it.' " (quoting *Willett v. Russell M. Stookey, P.C.*, 568 S.E.2d 520, 526 (Ga. Ct. App. 2002))).

¶ 56 Defendant further contends that the State did not lay an adequate foundation for the calls because it offered no evidence that the recordings were preserved without alterations. But "[g]iven the particular circumstances of any case, alterations, deletions, or editing may be necessary" to remove irrelevant, privileged, or otherwise inadmissible material. *Taylor*, 2011 IL 110067, ¶ 44. Indeed, the recordings played for the jury here were shortened portions of two longer calls. "In general, most editing will not render evidence inadmissible but rather will go to the weight of that evidence." *Id.* That is the case here. Because defendant offered no evidence "of tampering, substitution, or contamination," and made no "colorable claim" that the recordings were anything

"other than authentic or accurate," the State was only required to "establish a probability" that the recordings had not be tampered with or contaminated. *Sangster*, 2014 IL App (1st) 113457, ¶ 51. The State satisfied that burden here.

¶ 57    Finally, defendant contends that the evidence failed to sufficiently establish that the male voice on the recordings belonged to him. We disagree. Hofsteadter testified that inmates are required to provide their name and PIN in order to initiate an outgoing phone call. Hofsteadter's testimony and the call detail reports admitted into evidence establish that the recordings played for the jury were calls associated with defendant's PIN. Defendant notes Hofsteadter's testimony that an inmate can enter his name and PIN to initiate a call and then hand the phone to another inmate to talk. He also suggests that the phone system could have malfunctioned and improperly attributed a call made by another inmate to his PIN. Or, he speculates, the system may have simply provided Hofsteadter with the wrong calls in response to her queries. But defendant offers no evidence that any of these things happened here. The State was not required "to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be. Rather, the standard for authentication, and hence for admissibility, is one of reasonable likelihood." *United States v. Holmquist*, 36 F.3d 154, 168 (1st Cir. 1994).

¶ 58    The evidence was sufficient to establish a reasonable likelihood that the jail calls at issue were made by defendant and that defendant was the male voice heard on the recordings. As noted, the evidence established that the calls were made using defendant's PIN. In addition, the first call played for the jury began with an automated voice stating that "this is a prepaid collect call from," followed by a man saying defendant's name, "Ernest Reynolds." Later in the call, the man confirmed that the jail had his name spelled "E-R-N-E-S-T" and stated his jail identification

number, which the parties stipulated was defendant's booking number and the call detail reports list as defendant's PIN. Although no similar identifying information was stated or discussed in the second call, the male and female voices on the two calls appear to be the same. Moreover, the call detail reports show that the two calls were placed using the same inmate PIN and that the phone number dialed for both calls was the same, supporting an inference that the inmate who made the first call also made the second. Viewing the evidence in its entirety, we conclude that the trial court did not abuse its discretion in finding that the State laid a proper foundation for authenticating the recorded jail calls under the silent witness theory.

¶ 59                    C. Jury Instruction Concerning Jail Calls

¶ 60    Defendant also challenges the trial court's instructions to the jury with respect to the jail calls. Because the phone calls contained evidence that defendant had engaged in attempted witness tampering while in pretrial custody, the trial court instructed the jury in accordance with Illinois Pattern Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014) (hereinafter IPI Criminal). In particular, prior to Hofsteadter's testimony, the court instructed the jury:

> "Ladies and gentlemen, you are about to hear some evidence that the defendant was involved in conduct other than conduct charged in the indictment. This evidence is being offered on the issue of the defendant's consciousness of guilt and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in the conduct. And if so what weight should be given to the evidence on the issue of consciousness of guilt."

The court then added the following comments:

> "What you are about to hear are calls that the investigator will identify as being
>
> made by the defendant from the Cook County Department of Corrections. The fact
>
> that these calls were made by the defendant from the Cook County Department of
>
> Corrections must not be considered by you in any way in arriving at your verdict.
>
> That is, the fact that he was in the jail."

Defendant characterizes the court's latter comments as instructing the jury that defendant in fact made the calls at issue, contradicting the court's earlier instruction that it was for the jury to decide whether he was involved in the conduct and usurping the jury's role as finder of fact.

¶ 61 Defendant did not object to the instruction or raise the issue in his posttrial motion, so we consider this issue only for plain error. *People v. Mitchell*, 2018 IL App (1st) 153355, ¶ 39. Under the plain error doctrine, we may review an unpreserved assertion of error only if (1) a clear or obvious error occurred and the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant or (2) a clear or obvious error occurred, and the error was so serious that it affected the fairness of the trial and the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant seeks relief under the second prong of the plain error test, asserting that the challenged comments denied him a fair trial and undermined the integrity of the judicial process.

¶ 62 The first step in our plain error analysis is to determine whether the challenged jury instruction was erroneous. *Id.* Jury instructions are designed to convey the law that applies to the evidence presented. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). The instructions should not be misleading or confusing. *Id.* at 187-88. But their correctness does not depend on whether counsel

can imagine a problematic meaning but on whether ordinary persons acting as jurors would fail to understand them. *Id.* at 188. We must construe the trial court's jury instructions as a whole to determine whether they fairly and fully apprised the jury of the relevant legal principles. *People v. Parker*, 223 Ill. 2d 494, 501 (2006). However, where the trial court gives contradictory instructions on an essential issue of law, the giving of the correct instruction does not render the incorrect instruction harmless. *People v. Jenkins*, 69 Ill. 2d 61, 66 (1977). We review the correctness of a jury instruction *de novo*. *Parker*, 223 Ill. 2d at 501.

¶ 63    We find no error in the trial court's jury instructions concerning the jail calls. At the start of Hofsteadter's testimony, the court correctly instructed the jury, in accordance with IPI Criminal No. 3.14, that Hofsteadter was expected to testify that defendant "was involved in conduct other than conduct charged in the indictment" and that it was "for you [the jury] to determine whether the defendant was involved in the conduct." The court delivered the same instruction at the close of the case. At that time, the judge also instructed the jurors that it was their "duty to determine the facts and to determine them *** only from the evidence in this case" and that "[n]either by these instructions or by any ruling or remark which I have made do I mean to indicate any opinion as [to] the facts or what your verdict should be." See IPI Criminal No. 1.01 (approved July 18, 2014).

¶ 64    As noted, immediately following its delivery of IPI Criminal No. 3.14 at the start of Hofsteadter's testimony, the court also explained to the jury that "[w]hat you are about to hear are calls that the investigator will identify as being made by the defendant from the Cook County Department of Corrections." The court instructed the jury that "[t]he fact that these calls were made by the defendant from the Cook County Department of Corrections must not be considered

by you in any way in arriving at your verdict. That is, the fact that he was in the jail." Contrary to defendant's contention, these comments do not contradict the court's earlier instruction that it was for the jury to decide whether defendant was involved in the uncharged conduct heard on the calls.

¶ 65    The court did not tell the jury that defendant made the calls, as defendant suggests. Rather, the court told the jury that "[w]hat you are about to hear are calls that *the investigator will identify* as being made by the defendant from the Cook County Department of Corrections." (Emphasis added.) This comment previewed Hofsteadter's expected testimony and added context to the IPI Criminal No. 3.14 instruction the court had just delivered. The court's subsequent admonition— that the jury must disregard "[t]he fact that these calls were made by the defendant from the Cook County Department of Corrections"—also did not contradict the court's earlier instruction that it was for the jury to decide whether defendant made the calls in the first place. When assessing the correctness of jury instructions, the question is not whether counsel can imagine a problematic meaning, but whether reasonable jurors would fail to understand the instructions. *Herron*, 215 Ill. 2d at 188. Viewed in context, we think it is apparent that the jury would have understood the instructions as explaining that, *if* it determined that defendant made the calls, it could not consider the location from which the calls were made in reaching its verdict. Indeed, the court not only instructed the jury (immediately prior to delivering the challenged comments) that it was its duty to determine whether defendant was involved in the uncharged conduct but also instructed the jury at the close of the case that it was its duty to determine the facts and that no prior ruling or remark by the judge should be construed as indicating any opinion as to the facts.

¶ 66    In sum, we conclude that the trial court did not deliver contradictory instructions to the jury concerning its obligation to determine whether defendant was involved in the uncharged conduct

heard on the recorded jail calls. Nor, when viewing the trial court's instructions in their entirety, is there any reasonable likelihood that the jury would have understood the challenged comments as relieving it of its obligation as the finder of fact to determine whether defendant made the calls at issue. We thus find no error, let alone plain error, in the court's instructions with respect to the recorded jail calls.

¶ 67                                    D. Jury Deliberations

¶ 68    Defendant's final contention is that the trial court erred when it allowed the deliberating jury, on its request, to listen to the jail calls in the courtroom while the judge and the parties were present. He argues that this procedure chilled the jurors' deliberations and likely affected their verdict. Although defendant did not contemporaneously object to the procedure or raise the issue in his posttrial motion, he contends that we should reverse and remand for a new trial under the plain error doctrine because the asserted error affected the integrity of the judicial process.

¶ 69    Defendant relies primarily on *People v. Hollahan*, 2019 IL App (3d) 150556, ¶ 21, in which a different district of the appellate court held that a procedure similar to that employed here amounted to plain error that "inhibited the jurors' deliberations." After completion of briefing in this appeal, however, our supreme court reversed the appellate court's decision in *Hollahan*. See *People v. Hollahan*, 2020 IL 125091. The supreme court's decision disposes of defendant's claim for two reasons.

¶ 70    First, the supreme court held that it did not violate the sanctity of the jury's deliberations to allow the jury to review video evidence in the courtroom in the presence of the parties and the judge. Because there was no indication that the jurors communicated among themselves while in the courtroom, the court observed that it was more appropriate to say that the jury's deliberations

were *suspended* while they were in the courtroom reviewing the evidence and not that they were *engaged* in deliberations during that period. *Id.* ¶ 25. It is true that here, unlike in *Hollahan*, the trial court advised the jurors, after they had been brought back into the courtroom, that "we are not allowed to interact with you *while you're deliberating*" (emphasis added), which could be taken to suggest that deliberations remained underway at that time. By contrast, in *Hollahan*, the trial court explained to the jurors that it did " 'not have an arrangement to show [the video] to you in *your deliberation room*,' " which implied that deliberations could take place in the jury room and nowhere else. (Emphasis in original). *Id.* But the more important point in *Hollahan* was that "there [was] no suggestion that the jurors communicated amongst themselves while in the courtroom." *Id.* It was that fact that led the supreme court to conclude that "deliberations did not take place while the jury was reviewing the video." *Id.*

¶ 71   Here too, there is no indication that the jurors communicated among themselves (or with any nonjurors) while in the courtroom. It thus cannot be said that the jury was engaged in deliberations during that period. For that reason, we must reject defendant's contention that the presence of nonjurors in the courtroom while the jury listened to the jail calls impinged on the secrecy of the jury's deliberations. See *id.* ¶ 27 ("Because deliberations were not taking place in this case while the jurors were watching the video in the presence of non-jurors and there was no communication with non-jurors, there was no error.").

¶ 72   Second, the supreme court held in *Hollahan* that, even if it were error to allow the jury to review evidence in the courtroom in the presence of the parties and the judge, the defendant was not entitled to relief on plain error review because he had not shown that he was prejudiced by the procedure. *Id.* ¶ 23. In particular, the court noted that the defendant had not shown that any

nonjuror in the courtroom communicated with the jurors, either verbally or nonverbally. *Id.* The court also observed that there was no "indication that the presence of non-jurors 'chilled' deliberation by the regular jurors." *Id.* The same is true here. When the jury returned to the courtroom to listen to the calls, the trial court advised the jurors that "we are not allowed to interact with you while you're deliberating." Nothing in the record suggests that anyone in the courtroom violated that admonition. After the jury returned to the jury room, the trial court stated for the record that the jury had listened to the calls and had now resumed its deliberations. The court gave no indication that there had been any verbal or nonverbal communication with the jurors while they were in the courtroom.

¶ 73    Nor is there any indication that the presence of nonjurors in the courtroom while the jury reviewed the jail calls chilled or inhibited the jury's deliberations. Defendant speculates that the jurors were chilled by the trial court's comment that neither the judge nor the parties could interact with the jurors while they were reviewing the calls. But the trial court gave a similar admonition in *Hollahan*, advising the jury that it had " 'instructed everyone to not say a word.' " *Id.* ¶ 4. Far from establishing prejudice, the supreme court cited that comment as support for its finding that there was no error at all. *Id.* ¶ 25. And the supreme court cited the trial court's similar instruction to the parties to have " 'no conversation' " while the jurors were in the courtroom in support of its additional conclusion that the defendant could not show prejudice even if there were error. *Id.* ¶ 23. Likewise here, by informing the jurors that neither the court nor the parties could interact with them while they were in the courtroom reviewing the audio evidence, the trial court alleviated any possibility that the nonjurors' presence would inhibit or interfere with the jurors' deliberations.

¶ 74    Finally, defendant suggests that the jurors' inability to control the playing of the audio files themselves chilled their deliberations. But the trial court informed the jurors that they could "listen to [the recordings] as many times as you want" and that it would adjust the volume of the playback at their request. The trial court in *Hollahan* employed a similar procedure. See *id.* ¶ 4. Here, after the jury returned to the jury room, the trial court stated for the record that the jury had listened to one call twice and the other call once. Nothing in the record suggests that the court rebuffed any request by the jurors to listen to either call again or to adjust the volume. We cannot see how the procedure employed by the trial court would exert any chilling effect on the jury.

¶ 75    For all these reasons, even if the trial court had erred in allowing the jury to review the audio evidence in the courtroom with the parties and the trial judge present, defendant has not shown the type of prejudice that would entitle him to relief on such a claim under the plain error doctrine.

¶ 76                              E. Remand for Resentencing

¶ 77    In light of our holdings vacating defendant's attempted first degree murder conviction and affirming his convictions for aggravated criminal sexual assault and aggravated battery, we must remand to the trial court for resentencing on the aggravated battery conviction.[4] Under section 5-8-4(d)(2) of the Unified Code of Corrections (730 ILCS 5/5-8-4(d)(2) (West 2016)), a trial court must impose consecutive sentences when a defendant is convicted of, among other things, aggravated criminal sexual assault. Our supreme court has held that this provision "must be construed so that any consecutive sentences imposed for triggering offenses be served prior to, and independent of, any sentences imposed for nontriggering offenses." *People v. Curry*, 178 Ill. 2d

_____

[4]We note that the parties do not address this issue in their briefs.

509, 539 (1997). "Sentences for multiple nontriggering offenses may be served concurrently to one another after any consecutive sentences for triggering offenses have been discharged." *Id.*

¶ 78    Here, the trial court correctly imposed consecutive sentences on each of the aggravated criminal sexual assault convictions (the triggering offenses) and the attempted first degree murder conviction (the most serious nontriggering offense) and imposed a concurrent sentence on the aggravated battery conviction. Because we have vacated defendant's attempted first degree murder conviction, his sentence on the aggravated battery conviction (now the sole nontriggering offense) must run consecutively to his sentences on the aggravated criminal sexual assault convictions. We therefore remand to the trial court to resentence defendant accordingly.

¶ 79                                III. CONCLUSION

¶ 80    For the foregoing reasons, we vacate defendant's conviction for attempted first degree murder, affirm his convictions for aggravated criminal sexual assault and aggravated battery, and remand for the trial court to impose a consecutive sentence on the aggravated battery conviction.

¶ 81    Affirmed in part and vacated in part; cause remanded with directions.

¶ 82    PRESIDING JUSTICE GORDON, concurring in part and dissenting in part:

¶ 83    In the case at bar, the majority overturns a jury verdict of attempted murder and finds the State's evidence insufficient to support the jury's finding on intent. With all due respect, I find that the majority is substituting its own judgment for that of the jurors who heard the evidence first-hand. I cannot agree with this reversal and so must respectfully dissent from that portion of the opinion. However, I concur with the majority's findings that the trial court did not err in admitting audio recordings of two jail calls, that the trial court did not err when the jail calls were played in

the presence of the judge and the parties, and that the State was not required to prove that defendant intended to kill the victim by strangling her. Thus, I respectfully concur in part and dissent in part.

¶ 84    The majority finds that the State's evidence was insufficient to prove that defendant intended to kill the victim, even though defendant assaulted and threatened the victim numerous times with a deadly weapon and ran her over with his truck—all while stating his intent to kill her.

¶ 85    The majority finds that defendant was lying when he made all those statements that he intended to kill her. The majority finds that, despite what defendant was actually saying, what he really meant was to scare the victim and torture her but not kill her. The majority makes this credibility determination, although it did not hear or view the witnesses on the stand. At trial, the victim testified that defendant repeatedly stated, while she was in his truck, that he was going to kill her. Defendant stated, specifically, that he was going to drive to an alley to dump her body and then he, in fact, drove to an alley for that purpose. Defendant even explained why he had to kill her after beating and raping her: because otherwise she would run to the police. After the offense, defendant stated in a telephone call from jail that he was going to "get out there and kill that b***."

¶ 86    As the majority notes (*supra* ¶ 33), we must view all this evidence in the light most favorable to the State, drawing all reasonable inferences from it in favor of the State. We can overturn the jury's verdict for lack of intent only if no rational juror could find intent beyond a reasonable doubt. *Supra* ¶ 33. We may not substitute our judgment for the jury's verdict simply because we believe that we would have found differently if we were the ones in the jury box. *Supra* ¶ 33.

¶ 87    As the majority notes, rarely is intent to kill proven by the perpetrator's own statements. Supra ¶ 34. Often it must be inferred from the circumstances. *Supra* ¶ 34. However, this is the

unusual case where the perpetrator clearly and repeatedly stated his intent to kill, and somebody survived to report it.

¶ 88    The majority relies on three decades-old cases that are all distinguishable from the case at bar.

¶ 89    In the 50-year-old case of *People v. Thomas*, 127 Ill. App. 2d 444 (1970), the defendant was convicted after a bench trial of rape, as well as attempted murder, aggravated battery, and robbery. The appellate court found that the defendant's convictions for attempted murder and aggravated battery could not both stand and, therefore, vacated the attempted murder conviction on the ground that "there was insufficient proof that defendant intended or attempted to commit that crime." *Thomas*, 127 Ill. App. 2d at 455-56. Although the *Thomas* defendant stated repeatedly that he would kill the victim, he also departed the victim's home while she was still alive, saying "he would see her again." *Thomas*, 127 Ill. App. 2d at 447. By contrast, in the case at bar, defendant did not evince an intent to leave the victim alive. Defendant told the victim that he was driving to an alley to dump her body. After he, in fact, drove to the alley, she jumped out of his truck and managed to escape alive. Thus, *Thomas* is distinguishable because defendant in the case at bar did not willing abandon the victim but rather the victim escaped.

¶ 90    In the 30-year-old case of *People v. Jones*, 184 Ill. App. 3d 412 (1989), the three defendants were convicted after a bench trial of aggravated criminal sexual assault, as well as attempted murder, home invasion, and armed robbery. As in *Thomas*, the defendants in *Jones* departed the victims' home, leaving the victims alive. *Jones*, 184 Ill. App. 3d at 416-17. The *Jones* defendants were convicted of the attempted murder of both the wife who they raped and her husband who was also home at the time. *Jones*, 184 Ill. App. 3d at 429. In the case at bar, the majority quotes the

part of the *Jones* opinion which reversed the conviction for the attempted murder of the husband. *Supra* ¶ 39. However, the circumstances in the case at bar are far more similar to the circumstances relating to the wife in *Jones*, and that attempted murder conviction was affirmed. Thus, I do not find *Jones* persuasive here.

¶ 91    In the 30-year-old case of *People v. Garrett*, 216 Ill. App. 3d 348, 349 (1991), the defendant was convicted after a jury trial of attempted murder, aggravated battery, and armed robbery. The defendant placed a knife to the victim's throat and said, " 'give me your money or I will kill you.' " *Garrett*, 216 Ill. App. 3d at 350. By contrast, in the case at bar, defendant did not give the victim an "or." His statement that he would kill her was not dependent on an action or inaction by her. Thus, *Garrett* bears little similarity to the case at bar.

¶ 92    In the case at bar, the majority speculates that defendant's intent was "to torture or terrorize [the victim] into confessing that she cheated on him." *Supra* ¶ 41. However, the majority does not take that speculation to its logical conclusion: what does the majority think that defendant was going to do after such a confession—just let her go? Contrary to the majority's speculation, defendant could not have been more concrete about his intentions. Defendant explained that he had to kill the victim after beating and raping her because, otherwise, she would run to the authorities—which she did.

¶ 93    For the foregoing reasons, I cannot find a lack of intent in the face of defendant's clearly articulated intent and his cogent explanation for his actions, which he carried out—stopping only when the victim managed to escape. Thus, I must respectfully dissent from the portion of the majority's opinion that vacated defendant's conviction for attempted murder.

**No. 1-18-1227**

| | |
|---|---|
| **Cite as:** | *People v. Reynolds*, 2021 IL App (1st) 181227 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-CR-17130; the Hon. Thomas V. Gainer Jr., Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Ashlee Johnson, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Gina DiVito, and Elizabeth Dibler, Assistant State's Attorneys, of counsel), for the People. |