2021 IL App (1st) 191517-U

No. 1-19-1517

Order filed June 24, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 4943 |
| | ) | |
| EUGENE BROWN, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The evidence was sufficient to sustain defendant's attempt first degree murder conviction. Defendant forfeited the argument that the State committed prosecutorial misconduct in opening statement and closing arguments.

¶ 2    Following a jury trial, defendant Eugene Brown was found guilty of attempt first degree murder with the additional finding that, during the attempt murder, he personally discharged a firearm causing great bodily harm (720 ILCS 5/8-4 (West 2016); 720 ILCS 5/9-1(a)(1) (West 2016)), and aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)). The court

merged the counts into a single count of attempt first degree murder and sentenced defendant to 48 years' imprisonment. On appeal, defendant argues that the State failed to establish his guilt beyond a reasonable doubt and committed prosecutorial misconduct during its opening statement and closing argument. We affirm.

¶ 3    Defendant was charged by indictment with multiple offenses arising from the shooting of Andre Carothers, including attempt first degree murder and aggravated battery with a firearm.[1] Co-offender Yolanda Neely's bench trial proceeded simultaneously with defendant's jury trial.[2]

¶ 4    The State began its opening statement: " 'This, Mother F***, this a hit. You know what it is, b***.' His words. Not mine," and asserted that defendant said this to Carothers after shooting him.

¶ 5    At trial, Carothers testified that he was convicted in 2004 for criminal drug conspiracy and manufacture or delivery of cocaine. Defendant and Neely, who dated, were his old friends and he identified them in court. On October 12, 2017, Carothers was drinking at the home of Latoyce Pinckney, his ex-girlfriend. Carothers denied Pinckney told him that she had a problem with Neely earlier that day.

¶ 6    Carothers left Pinckney's home and walked 150 or 200 feet to the intersection of Whipple Street and Madison Street, where he awaited a ride home. A liquor store, Rothschild's, sat at the corner. It was dark, but there were streetlights. Someone shot Carothers, but Carothers denied

---

[1] Carothers's last name is spelled in various ways throughout the record. We adopt the spelling from his testimony.
[2] Neely's last name is spelled both Neely and Neeley in the record. We adopt the spelling from the notice of appeal in her separate appeal, No. 19-2060.

knowing or remembering the shooter's identity. He did not recall seeing defendant exit a red Pontiac Montana minivan on Whipple prior to the shooting.

¶ 7    On October 19, 2017, Carothers spoke with police officers in the hospital, but he did not recall what he told them. Carothers testified that he was "under the influence" when he was shot, the officers told him who was involved in the shooting, and he did not identify defendant as his shooter before the officers asked him any questions. On November 5, 2017, Carothers met Detective Brian Drees at the police station. Carothers acknowledged that he signed photographs of defendant and Neely at the police station. While he did not tell Drees that he did not recall what happened, he denied recalling what he told Drees.

¶ 8    Carothers agreed that, before trial, the prosecutor had shown him a video which depicted Carothers speaking with Drees and an assistant State's Attorney (ASA), and admitted that the video did not depict him stating he did not recall what happened. However, when asked about specific statements he made to the ASA during the video, Carothers did not recall making them.

¶ 9    The court admitted the videotaped statement into evidence and the State published the video to the jury. The video is included in the record on appeal. In the video, ASA Jason Fisher identifies himself, Drees, and Carothers. Carothers states he has known defendant for approximately 40 years, and the two were once best friends. Carothers identifies and signs photographs of defendant and a woman he knows as "Yoshi," who was in a relationship with defendant and whom Carothers had seen regularly for three or four years.

¶ 10    Carothers explains that, around 8:29 p.m. on October 12, 2017, he was in an alley off Whipple and saw Yoshi driving a maroon Montana van approximately five to seven feet away, with defendant in the passenger seat. There were streetlights and alley lights. Carothers exited the

alley and walked towards Whipple and Madison, where Rothschild's is located, to await a ride. The van parked on the side of Rothschild's. He then saw defendant walking down Whipple towards Madison.

¶ 11 Defendant confronted Carothers regarding a fight between Yoshi and Carothers's ex-girlfriend, of which Carothers was unaware. Carothers and defendant were three or four feet apart and no one else was on the sidewalk. Carothers was not holding anything and did not raise his hands towards defendant. Defendant drew a firearm, began shooting Carothers, and continued discussing the fight. Carothers fell facedown. The van pulled away, and defendant paused before shooting Carothers several more times. Carothers last remembered asking if defendant would kill him, and defendant responding, "This, mother***, this is a hit. You know what it is." Carothers confirms that the police officers had treated him well and his statement was not the result of threats, promises, or coercion, but his own free will.

¶ 12 Carothers further testified he had seen a video of himself being shot, but did not recall identifying himself on the video and stated the video was dark. He identified People's Exhibit No. 4 as the video he had seen, but was not sure if it showed him and the corner where he was shot. The video was admitted into evidence. Carothers did not recall lying on the ground after being shot in the area depicted in the video or speaking to the paramedics.

¶ 13 On cross-examination, Carothers agreed that he used to sell narcotics near where he was shot. He was drinking Hennessy alcohol at the time of the shooting. When the paramedics arrived, the shooting was fresh in his mind and he told a paramedic named Jose Val Limbo that he did not know who shot him.

¶ 14    Carothers confirmed that he had been on house arrest, but denied it was for a case relating to selling narcotics and stated it was due to a driving case which had been thrown out. Carothers confirmed he had another narcotics case earlier that year which was "dismissed" following a jury trial. Carothers further confirmed that, at the time of trial, he had been charged with criminal contempt. The court then explained to the jury that Carothers had previously been subpoenaed to appear for trial but did not, the State filed a contempt petition against him, and the court issued a warrant to ensure his appearance.

¶ 15    Following Carothers's testimony, outside the jury's presence, the State advised the court that it withdrew the contempt petition against Carothers.

¶ 16    Pinckney testified that she had known Neely and defendant for a few years and identified both in court. On October 12, 2017, Neely and defendant were dating. Pinckney fought Neely around 7 p.m. that evening. Following the fight, Pinckney called the police and went home. She did not know where Neely went. Just after midnight on October 13, Pinckney called a detective and stated that she observed Neely drop off defendant in the area and then saw defendant shoot Carothers. She testified, however, that she did not actually see either event because she was in her house.

¶ 17    The detective drove Pinckney to the police station, where a different detective administered photograph arrays. Pinckney identified an advisory form and photograph array she signed, and confirmed that a statement written on the advisory form indicated that she stated the person whose photograph was circled was the driver and that person's boyfriend was the passenger and shooter, but testified that the statement was a lie. Pinckney then identified another advisory form and photograph array she signed. The advisory form indicated that Pinckney stated the person whose

photograph she circled shot Carothers and that Pinckney had argued with the shooter's girlfriend. The exhibits are in the record on appeal, and the second photograph array contains the notation "he did it" near the circled photograph.

¶ 18    Pinckney had a videotaped conversation with Drees, another detective, and an ASA, but testified that she had not seen what she told them she saw. Pinckney confirmed that she had viewed the video, which accurately depicted the conversation. The video was admitted into evidence, published to the jury, and is in the record on appeal.

¶ 19    In the video, ASA Luis Muniz, Drees, and another detective identify themselves, and Muniz notes that it is 5:11 p.m. on October 13, 2017. Pinckney confirms that she spoke with Muniz previously and detailed the events of the shooting. Pinckney states she knew defendant and Neely from around the neighborhood. Pinckney saw Neely about once a week for the three prior years and had seen defendant, who dated Neely, approximately 10 times before. She identifies and signs photographs of defendant, Neely, and Carothers, her boyfriend. She cries as she identifies Carothers's photograph. Pinckney states that she knows defendant to carry a firearm and had seen him with a firearm approximately three times before.

¶ 20    Pinckney confirms that, around 8 p.m. on October 12, 2017, Neely requested Pinckney drive her to her vehicle, Pinckney dropped Neely off near the maroon Montana van which Pinckney knew Neely had recently obtained, and Neely confronted Pinckney over an old social media message. Pinckney then parked at Madison and Whipple, and Neely arrived in the maroon van. Neely and Pinckney exited their vehicles and fought for about two minutes. Pinckney called the police, who arrived quickly and told everyone to leave. Pinckney then parked her vehicle in an alley behind her home.

¶ 21     Pinckney sat in her vehicle for 15 to 20 minutes, then saw Neely and defendant enter the alley from Whipple in Neely's van. She saw defendant's face as he lay back in the passenger seat. The front windows of the van were not tinted, and Pinckney could see through them clearly.

¶ 22     Carothers exited Pinckney's home and had a short argument with Pinckney. He then walked down the alley towards Sacramento Boulevard. The van reversed and drove towards Whipple. Pinckney followed the van on foot, and from the mouth of the alley looked towards Madison and Whipple. Nothing blocked Pinckney's view, and although it was dark, there were streetlights and lights on Rothschild's storefront. She saw defendant and Carothers arguing right next to each other. She had not seen defendant exit the van. Neely remained in the van's driver's seat.

¶ 23     Pinckney demonstrates how defendant drew a firearm from his waistband and pointed it at Carothers. Carothers raised his hands, which Pinckney demonstrates, and ducked. From four or five feet away, defendant fired two shots at Carothers. Pinckney ran through the alley towards her home, called the police, and told the dispatcher that a maroon Montana van was "shooting people." She heard the van drive away but did not hear more gunshots. An ambulance and police officers arrived quickly. Pinckney then walked back towards Whipple and Madison and saw Carothers lying on the ground shot.

¶ 24     Pinckney confirms that she viewed photographs at the police station around 2:20 a.m. on October 13, 2017, and identifies an advisory form and photograph array in which she identified Neely as the driver of the van by circling Neely's photograph and placing her name and birthday near the photograph. She then identifies an advisory form and photograph array in which she identified defendant as the shooter by circling his picture, writing "he did it," and adding her name

and birthday. Pinckney confirms that the advisory forms indicated she had not consented to being recorded while she viewed the arrays, but that she now consents to be videotaped. Pinckney confirms she is giving the statement freely and voluntarily, she had been treated well by the officers, her statement was not the result of threats or promises, and that she was not under the influence of drugs or alcohol during her videotaped statement or when she spoke with Muniz previously.

¶ 25    Pinckney further testified that, the morning of trial, she met with prosecutors and stated that she did not remember what happened and had been drinking that morning. She identified the maroon vehicle in People's Exhibit No. 4 as Neely's.

¶ 26    On cross-examination, Pinckney stated that, in 2017, she had been dating Carothers for approximately five years. She first agreed that she called the police from her cell phone right after her fight with Neely around 7:30 or 8 p.m., and the police broke up the fight. She then stated, however, that she did not call the police after the fight, but officers were already arriving. She called the police approximately an hour later when she heard gunshots, and told the dispatcher that there was a male passenger in a maroon Montana van shooting people and the occupants were from the 20 block of South Harding Avenue, but did not give defendant's or Neely's name. Pinckney had been drinking that day and denied that Carothers was with her. She was also drinking the day of her videotaped statement. Pinckney confirmed that she did not see defendant shoot Carothers, she was under oath, and she was telling the jury the truth.

¶ 27    Drees testified that he was assigned to the investigation around 8:30 p.m. on October 12, 2017, and proceeded to Whipple and Madison. On the east side of Whipple is Rothschild's and to the west of Whipple is a vacant lot. An alley runs east to west just south of Rothschild's.

¶ 28    Drees observed blood, clothing, and what appeared to be four bullet fragments on the sidewalk. Drees obtained footage from cameras affixed to Rothschild's, which captured a shooting. Drees identified People's Exhibit Nos. 4 and 17 as the footage, which were admitted into evidence, published, and are included in the record on appeal.[3] Neither video includes any audio.

¶ 29    The first video depicts an intersection. It is dark, but bright light emanates from the storefront and there is street lighting. A person walks towards the intersection on the same side of the street as the camera and leaves the frame. A red or maroon van then arrives and parks near the intersection. A second person then walks towards the intersection from the same direction as the first. The two individuals then walk back the way they came, passing by the van. They are a few feet apart and appear to speak to each other. They exit the frame. The second person then reappears, moving quickly, and gestures towards a point on the ground just offscreen. The person walks towards the passenger door of the van, but circles and gestures towards the ground in the same place. The van pulls forward and turns right, and the person jogs in the same direction.

¶ 30    The second video depicts the same events but is filmed from the side of the store. As the two people speak, the second person turns towards the first person and points something at that person. The first person raises his hands and falls to the ground. The second person approaches the other person, leans down, and gestures. A muzzle flash is visible. The shooter circles towards the van and then back towards the person on the ground and gestures downward again. The van drives away, and the shooter follows the van. The victim lies on the ground.

---

[3] Both videos are contained on a CD, but the file names do not distinguish which is People's Exhibit No. 4 and which is People's Exhibit No. 17.

¶ 31    Drees learned that the victim was sedated and intubated at the hospital, and returned to the police station. After midnight on October 13, 2017, Drees received a phone call from Pinckney, who stated that she witnessed part of the shooting and that defendant shot her boyfriend, Carothers. Pinckney also provided Neely's name. Drees asked if Pinckney would come to the police station and sent other officers to pick her up. Drees then prepared photograph arrays for another detective to show Pinckney.

¶ 32    Pinckney arrived at the police station and viewed the arrays. Drees identified the advisory forms and photograph arrays, in which Pinckney identified Neely and defendant and wrote "he did it" near defendant's photograph.

¶ 33    Drees and another officer then spoke with Pinckney, and Pinckney related the events she later described in her videotaped statement. Pinckney told Drees she could show him Neely's residence, where defendant often stayed, and they drove to the 2700 block of South Central Park Avenue, where Pinckney identified Neely's residence. As they drove away, Pinckney identified Neely's maroon Montana van, which resembled the van depicted in the videos. The officers took Pinckney home, then returned to the residence, where they saw Neely, whom Drees identified in court. Drees spoke with Neely and arrested her. Neely gave Drees a set of keys which Drees used to open the Montana van. The address Neely gave while being processed matched the residence Pinckney had identified.

¶ 34    Pinckney returned to the police station and spoke with Drees and Muniz. Pinckney repeated what she had told Drees. Muniz then spoke with Pinckney privately, and Pinckney agreed to give the videotaped statement.

¶ 35    On October 19, 2017, Drees spoke with Carothers, who was hospitalized in intensive care. Carothers told Drees that defendant shot him and Neely was present. Drees then showed Carothers photographs of defendant and Neely, but Carothers was too weak to sign them.

¶ 36    Carothers came to the police station on November 5, 2017, and gave a more detailed statement. Fisher arrived and met with Drees and Carothers, and then Carothers alone, and Carothers agreed to give the videotaped statement.

¶ 37    On cross-examination, Drees testified that he requested the maroon van be towed and held for investigation, but he never requested an evidence technician process the vehicle. Drees ran the van's license plate and received a vehicle identification number, but did not recall the vehicle identification number being affiliated with a different vehicle.

¶ 38    The State entered a stipulation that a Chicago police detective would testify that he administered to Pinckney two photograph array packets prepared by Drees and did not speak with Drees about the investigation, and would identify the advisory forms and photograph arrays.

¶ 39    Officer Balcarzak testified that he was an evidence technician with the Chicago Police Department.[4] Balcarzak processed the scene at Whipple and Madison, and observed bloody, discarded clothes, a blood stain, and firearm evidence on the sidewalk. Balcarzak recovered the evidence and took photographs which were published to the jury. On cross-examination, Balcarzak testified that no one requested he process a red van.

¶ 40    Dr. Harvey Louzan testified that he worked in the emergency room the night of October 12, 2017. Carothers arrived by ambulance around 9:30 p.m. in critical condition. Carothers had been shot five times, in his right hand, left arm, right chest, left chest, and the back of his head.

_____

[4] Officer Balcarzak's first name is not in the report of proceedings.

He stabilized in a medically-induced coma. Scans revealed a large bullet fragment in his skull and a small blood clot or small amount of bleeding surrounding his brain, air in his plural cavity, a contusion and laceration of his lung, and two fractured vertebrae.

¶ 41    Muniz testified that he spoke with Pinckney at the police station around 5 p.m. on October 13, 2017. Pinckney spoke clearly and concisely, but was "visibly distraught" and occasionally cried. Pinckney agreed to give a videotaped statement and told Muniz privately she had not been forced or threatened to speak with him, gave her statement freely and voluntarily, and that her statement described what she had witnessed.

¶ 42    Fisher testified that he met with Carothers at the police station on November 5, 2017. Carothers agreed to give a videotaped statement and never told Fisher that the police suggested to him who had shot him.

¶ 43    ASA Christopher Thor Martin testified that he met with Pinckney and Carothers the morning of trial. Pinckney told Martin that she could not remember anything from the shooting. Carothers had been subpoenaed for a previous court date and did not appear, so Martin's office filed a petition for contempt against him and the court issued a warrant for his arrest.

¶ 44    On cross-examination, Martin confirmed that the petition for contempt against Carothers had been withdrawn following Carothers's testimony. Martin was in the courtroom for Carothers's testimony and for approximately 20 seconds of Pinckney's testimony while dropping off a document. He had introduced himself to Fisher and Muniz, whom he had never met before, and spoke to defense witnesses whom he knew the other ASA's had not spoken to previously. He did not speak to the witnesses about their testimony.

¶ 45    The defense called Limbo, who refreshed his memory with his run sheet from October 12, 2017, when he treated Carothers. Carothers had been shot but was alert and oriented. Limbo asked Carothers if he knew who shot him, and according to the run sheet, Carothers stated an "unknown person" shot him. Had Carothers named the shooter, Limbo would have written it down and told the police.

¶ 46    On cross-examination, Limbo agreed that, apart from the run sheet, he did not recall what happened on October 12, 2017, including Carothers's appearance or where he was shot. When a patient responds that he does not know who shot him or gives no answer, Limbo writes that the shooter is unknown. On redirect examination, Limbo testified that if the run sheet indicated the patient stated the shooter was unknown, that is what happened.

¶ 47    Erin Hansen, a supervisor for the City of Chicago's Offices of Emergency Management Communication (OEMC), testified that OEMC keeps records of 911 calls that show the phone number placing the call. No calls regarding a fight near Sacramento and Madison were made between 7 and 8 p.m. on October 12, 2017. Hansen identified a report for a phone number which indicated that a 911 call came from that number at 8:35 p.m. on October 12, 2017. On cross-examination, Hansen stated that she did not have an audio recording of that call.

¶ 48    Carol Knudsen testified that she took 911 calls for OEMC. When a 911 call comes in, the employee taking the call puts the information into a ticket. Knudsen identified a ticket she created for a 911 call at "8:35" on October 12, 2017. The ticket noted the phone number from which the call came but did not indicate that the caller gave a name.

¶ 49    On cross-examination, Knudsen agreed that all she wrote on the ticket was "Red Montana van, female black, dark skinned driving, male passenger shooting, they live at 27 South Harding."

Knudsen did not remember taking the call, but, based on the ticket, stated that the caller was frantic as she relayed what she saw.

¶ 50    The defense entered a record from the Illinois Secretary of State that the vehicle identification number associated with the license plate Drees searched from the maroon van matched a 2002 Lincoln Continental. The defense also entered a stipulation that an employee of the City of Chicago's auto pound would testify that a 2002 Pontiac van, with a vehicle identification number which was different than the one Drees obtained and linked to someone other than Neely, was held there on October 13, 2017, and that a notice of disposal of unclaimed vehicle was sent to that person in January 2018.

¶ 51    The State began its closing argument:

> " 'B*** mother***, this is a hit. You know what this is. This is a hit.' Eugene Brown knows Andre Carothers. There's an argument between Eugene Brown's girlfriend and the ex of Andre Carothers, and Eugene Brown was going to take care of it. 'B*** mother***, this is a hit, you know what this is.' "

¶ 52    Later, the State argued that the statement showed that defendant intended to kill Carothers. The State again referred to the statement in rebuttal.

¶ 53    The jury found defendant guilty of attempt first degree murder with the additional finding that, during the attempt murder, he personally discharged a firearm causing great bodily harm, and aggravated battery with a firearm. Defendant's motion to reconsider or for a new trial was denied. The court merged the counts into one count of attempt first degree murder, and following a hearing, sentenced defendant to 48 years' imprisonment. Defendant's motion to reconsider sentence was denied.

¶ 54    On appeal, defendant first argues that the State failed to prove he was the shooter where neither Carothers nor Pinckney identified him as the shooter at trial. Defendant further alleges that the record on appeal contains no evidence that Carothers or Pinckney told police officers that defendant was the shooter, and even if Pinckney so advised the officers, she recanted at trial.

¶ 55    When a defendant challenges the sufficiency of the evidence, we review whether, considering the evidence in the light most favorable to the State, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48. We draw all reasonable inferences in favor of the prosecution. *People v. Lloyd*, 2013 IL 113510, ¶ 42. The trier of fact is responsible for fairly resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *Brown*, 2013 IL 114196, ¶ 48. "Therefore, a reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses." *Id.* We will only reverse a conviction if the evidence is so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt of the defendant's guilt. *Id.*

¶ 56    Defendant was convicted of attempt first degree murder. "A person commits the offense of attempt when, with intent to commit a specific offense, he or she does any act that constitutes a substantial step toward the commission of that offense." 720 ILCS 5/8-4(a) (West 2016). In turn, a person commits first degree murder when he, without legal justification, kills another person while intending to kill or do great bodily harm to that person or knows that his actions will cause the person's death. 720 ILCS 5/9-1(a)(1) (West 2016).

¶ 57    Accordingly, to prove defendant's guilt of attempt first degree murder, the State must show that defendant "performed an act that constituted a substantial step toward the commission of first

degree murder and that the defendant did so with the specific intent to kill the victim." *People v. Reynolds*, 2021 IL App (1st) 181227, ¶ 34. A defendant's intent is rarely shown by direct evidence and may be inferred from surrounding circumstances such as the attack's character, the use of a deadly weapon, and the nature and extent of the injuries inflicted. *Id.* Shooting a firearm at another person has been held to be evidence that the defendant acted with the intent to kill. *People v. Tabb*, 374 Ill. App. 3d 680, 693-94 (2007).

¶ 58    At the outset, we observe that Carothers's and Pinckney's videotaped statements were admitted into evidence and published during the trial as prior inconsistent statements. See 725 ILCS 5/115-10.1 (West 2018). Carothers testified that he did not know or remember who shot him, and although he identified the video of himself talking to Drees and Fisher, he did not recall relaying the events that he described. In the video, which is included in the record on appeal, Carothers details how he knew defendant nearly all his life. He explains that he saw defendant and Neely in a maroon Montana van five to seven feet away in an alley, and when he walked to Madison and Whipple, he observed the van parked on the street. Then, according to Carothers, defendant confronted him, drew a firearm, and shot him multiple times from several feet away. Carothers asked if defendant would kill him, and defendant responded that the shooting was "a hit." Fisher testified that he spoke with Carothers in private and Carothers did not tell him that the police suggested his shooter's identity. Moreover, Drees testified that Carothers identified defendant as the shooter while in the hospital on October 19, 2017.

¶ 59    Likewise, Pinckney testified at trial that she did not see who shot Carothers. In her videotaped statement, however, she stated that she had fought with Neely, saw Neely and defendant in Neely's van in the alley behind her home, followed the van when it drove to Whipple

after Carothers left her home, and saw defendant and Carothers arguing near the parked van before defendant shot Carothers. Muniz testified that he spoke privately with Pinckney and she indicated she was giving her statement freely and voluntarily. Thus, the jury had the opportunity to determine Carothers's and Pinckney's credibility in view of their trial testimony and videorecorded statements, and we will not substitute our judgment for the jury's. *Brown*, 2013 IL 114196, ¶ 48.

¶ 60 To the extent defendant argues that Carothers did not tell Limbo that defendant was the shooter, Limbo testified that his reports state an offender is "unknown" both when the patient states he does not know who shot him or gives no answer. Notably, Carothers stated in his videotaped statement that the last thing he remembered was defendant saying that the shooting was "a hit" and continuing to shoot him, and at trial he testified that he did not remember speaking to the paramedics, although he also testified that he told Limbo he did not know who shot him. Based on this evidence, a rational trier of fact could conclude that defendant was unable to identify the shooter for Limbo moments after being shot five times, including in his head. See *id.* (trier of fact may draw reasonable inferences from basic facts to ultimate facts). In any case, again, it was the jury's responsibility as the trier of fact to weigh the evidence and determine the witnesses' credibility (*id.*), and contrary to defendant's contentions, there is ample evidence in the record on appeal that Carothers and Pinckney named defendant as Carothers's shooter. We will not substitute our judgment for the jury's, and conclude that a rational trier of fact could find the State proved defendant's identity as the offender beyond a reasonable doubt.

¶ 61 Next, defendant argues that the State committed prosecutorial misconduct during opening statement and closing arguments by asserting that defendant swore at Carothers and said that the

shooting was "a hit." According to defendant, that statement was "never actually adduced by witnesses at trial," and moreover, "unduly inflamed the jury."

¶ 62    As the State notes, the defense did not contemporaneously object to the State's use of the statement during opening statement and closing arguments. Consequently, the issue is forfeited. See *People v. Cregan*, 2014 IL 113600, ¶ 15 ("To preserve an issue for review, a party ordinarily must raise it at trial and in a written posttrial motion.").

¶ 63    Defendant neither acknowledges that he failed to preserve the issue for review nor requests review under the plain-error doctrine. Accordingly, defendant has forfeited his argument that the State committed prosecutorial misconduct and unduly inflamed the jury. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued in opening brief are forfeited); see also *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010) ("[W]hen a defendant fails to present an argument on how either of the two prongs of the plain-error doctrine is satisfied, he forfeits plain-error review.").

¶ 64    Forfeiture aside, however, we observe that defendant's argument that the challenged statement was never adduced at trial is unfounded. To the contrary, while he denied recalling it at trial, Carothers provided a substantially similar statement in his videotaped interview. Carothers's videotaped statement was admissible as substantive evidence where (1) it was inconsistent with his testimony at trial that he did not recall the events of the shooting; (2) he was subject to cross-examination on the statement; (3) the statement narrated, described, or explained an event of which he had personal knowledge; and (4) Drees testified that the video truly and accurately captured Carothers's interview. See 725 ILCS 5/115-10.1(a), (b), (c)(2)(C) (West 2018) (prior inconsistent statements admissible if inconsistent with trial testimony, witness is subject to cross-examination on statement, statement narrates, describes, or explains event or condition of which witness had

personal knowledge, and statement is proven to have been accurately recorded); see also *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 61 (prior inconsistent statements admissible as substantive evidence to prevent witness from denying earlier statement made under circumstances indicating it was likely true). Accordingly, the State did not commit misconduct by referring to the statement in opening statements and closing arguments, in which it contended the statement proved defendant's intent to kill Carothers. *People v. Jones*, 2016 IL App (1st) 141008, ¶ 21 (prosecutors given wide latitude during opening statements and closing arguments and may comment on evidence if comments not intended only to arouse prejudice and passion of jury).

¶ 65    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 66    Affirmed.